# SYLVANUS STOKES

*vs.*

## HARRY B. WOLF.

*Brokers—Action for Commissions—Evidence—Oral Sale—*
*Purchaser's Financial Ability.*

In determining the legal sufficiency of the evidence to establish the facts alleged in the declaration, the truth of all the evidence in favor of the plaintiff's contention is assumed, and also all inferences and implications which may be legitimately and naturally drawn from it.　　　　　　　　　p. 397

In an action for commissions, it was proper to instruct that, if defendant employed plaintiff to sell or find a purchaser or purchasers for the property, and plaintiff procured purchasers ready, willing, and able to purchase it on the terms authorized by defendant, and defendant was advised of that fact, and the names of said purchasers were disclosed to defendant, and defendant agreed to said sale to said purchasers, and defendant agreed to pay plaintiff a commission or fee of a named sum, and defendant was given an opportunity to complete the sale to said proposed purchasers, but defendant defaulted and refused to consummate said sale, then their verdict must be for plaintiff for said sum.　　　　　　　　　pp. 395, 406

Where a ruling on a motion to strike out testimony is included in the same bill of exceptions as rulings on prayers, the former ruling will not be considered on appeal.　　　　p. 407

In an action to recover commissions for effecting a sale, *held* that there was sufficient evidence to go to the jury as to whether defendant agreed with the purchasers procured by plaintiff to sell the property to them, and whether in making such agreement one of the purchasers was authorized to speak for the other.　　　　　　　　　p. 408

In an action to recover commissions, if the purchaser procured by plaintiff, with knowledge of the terms of a mortgage on the property, assumed payment of the mortgage, it is not material that the evidence did not show such terms.　　　　p. 409

That the agreement of sale, between defendant and the purchasers procured by plaintiff, was not put in writing, is no defense to the claim for commissions, if this was defendant's own fault. p. 409

Plaintiff having procured purchasers for defendant's property, who agreed with him on the terms of sale, and were accepted by him as purchasers, but with whom he later refused to make a formal contract, without assigning any reason for such refusal, after which he sold the property to another, *held* that the burden was on defendant, and not on plaintiff, to show that such purchasers were financially able to perform their contract. p. 411

That when plaintiff was employed as broker a certain price was tentatively named by defendant as being what he desired to obtain, does not affect the latter's liability for commissions on a sale effected by plaintiff at a lower price, at which defendant agreed to sell it. p. 412

One cannot recover commissions as against his employer if, without the latter's knowledge, he also acted, in negotiating the sale, for the other party to the transaction. p. 412

That plaintiff spoke of the purchasers procured by him as his "clients," or that they were such, does not show that he was acting for them in the negotiations leading to the sale. p. 413

If defendant, after having employed plaintiff to sell property, felt that the latter's interest in his commissions might affect his fidelity to defendant, he should have terminated the employment, and if, with full knowledge of all the circumstances, he retained plaintiff in his employment, he cannot refuse to pay commissions on a sale subsequently effected by the latter. p. 413

There being evidence, in an action for commissions, that defendant, after accepting the proposed purchasers procured by plaintiff, prevented the consummation of the sale by his own default, *held* that there was no reversible error in the admission of certain evidence to the effect that such proposed purchasers were ready, able, and willing to buy the property. p. 414

*Decided January 11th, 1921.*

Appeal from the Court of Common Pleas of Baltimore City (HEUISLER, J.).

The plaintiff's prayer was as follows:

"If the jury find that the defendant employed the plaintiff to sell or find a purchaser or purchasers for the Caswell Hotel, and that the plaintiff procured purchasers who were ready, willing and able to purchase the said property upon the terms authorized by the defendant, if the jury so find; and that the defendant was advised of that fact, and that the names of said purchasers were disclosed to the defendant, and that the defendant agreed to said sale to said purchasers, and that the defendant agreed to pay the plaintiff a commission or fee of fifteen thousand dollars ($15,000), and that the said defendant was given an opportunity to complete the sale to the said proposed purchasers, but that said defendant defaulted and refused to consummate said sale; then, their verdict should be for the plaintiff for said sum of fifteen thousand dollars ($15,000).

The cause was argued before BOYD, C. J., BRISCOE, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Alexander Preston* and *Randolph Barton, Jr.,* with whom were *C. R. Wattenscheidt* and *Preston & Field* on the brief, for the appellant.

*Charles F. Harley,* with whom were *Israel B. Brodie* and *Albert F. Wheltle* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the court.

The appeal in this case was taken from a judgment of the Court of Common Pleas of Baltimore in favor of the plaintiff in an action brought by the appellee against the appellant for the recovery of commissions for services claimed to have been rendered in procuring a purchaser for the Hotel Caswell in Baltimore City.

The declaration contains the common counts, and a special count, in which it is stated that

> "the defendants employed the plaintiff at and for a compensation of $15,000 to sell or find a purchaser of the property known as the Caswell Hotel; and that the plaintiff procured purchasers who were ready, willing, and able to purchase the said property upon terms authorized by the plaintiff's employers; that the said employers were advised of that fact, and the names of the purchasers were disclosed to the said employers, and the said employers were given an opportunity to complete the sale to the said proposed purchasers; and that the said sale was not consummated because of the said employers' default, in that after having agreed to make the said sale, they subsequently refused to make the same, and the defendants refused and still do refuse to pay the plaintiff."

The declaration was supplemented by a bill of particulars setting forth in detail the claim presented under the common counts. There were originally two defendants, Sylvanus Stokes and the Caswell Hotel Company, both of whom pleaded the general issue, but at the close of the testimony the case against the Caswell Hotel Company was dismissed.

The record submits eight exceptions, seven of which relate to the court's rulings on evidence, and one to its rulings on the prayers and on motion to strike out evidence. The main questions presented by the appeal are whether there is to be found in the record any evidence legally sufficient to show: first, whether there ever was any such contract of employment as that set up by the appellee in his *narr.*; and second, whether he did in fact procure a purchaser ready, able and willing to buy the property upon terms satisfactory to the appellant, and third, whether the appellant accepted such purchaser.

Since the legal sufficiency of the evidence to establish these facts is challenged, it becomes necessary to review the testi-

mony in connection with them. In such an examination not only is the truth of all the evidence in favor of the plaintiff's contentions assumed, but also all inferences and implications which may be legitimately and naturally drawn from it. The contentions of the respective parties, as to what the transaction between them concerning the Caswell Hotel really was, were directly opposed, and the testimony in the case is entirely consistent with that conflict.

The appellee contends that he was employed at a stated compensation to procure a purchaser for the hotel, and that acting under such employment he did procure persons ready, able and willing to buy it upon terms satisfactory to the appellant, and that the appellant accepted such purchasers and agreed to sell the property to them, but that afterwards, without any default on the part of such proposed purchasers or the appellee, he refused to consummate that sale, but sold the property to another.

On the other hand the appellant contends that he never employed the appellee to sell the property at all, that he never agreed to pay him any commission for its sale, but expressly declined to do so, and that the appellee never procured any person except himself as a possible purchaser, and that all the negotiations between them in reference to the hotel were in connection with the appellee's efforts to buy it for himself.

Sylvanus Stokes, the appellant, who has been for a number of years engaged in the business of building, developing and selling hotels in various cities, came to Baltimore in 1889, where he remained until 1897. Shortly after the Baltimore fire in 1904, he built and for a time operated the Caswell Hotel. Although that property was nominally owned by the Caswell Hotel Company, Stokes, as the owner of virtually all the stock of the company, was its real owner. After carrying on the hotel himself for about a year, Stokes leased it for short periods to several tenants and finally to Mr. Harry Busick, who became its owner through purchasing the

stock of the Caswell Hotel Company in 1918. For some time before its sale to Mr. Busick in 1918, Mr. Stokes had been trying to find a purchaser for the property, and had repeatedly, "possibly a dozen times," offered it to Mr. Busick, but up to that time without success.

It was under these circumstances that the negotiations, which form the subject matter of this case, began between the parties to it. In discussing the testimony relating to them reference will be made principally to that portion of it which tends to support the contention of the appellee, since we are concerned not with its weight, but with its legal sufficiency to entitle the plaintiff to recover under the pleadings.

Testifying in his own behalf, the plaintiff said that, in the early spring of 1917, Mr. Stokes came to his office to see him "about getting a customer for the Caswell Hotel," that in that interview Mr. Stokes told him he owned the hotel and wanted to sell it, and gave the witness the detailed information which he felt he should have to discuss its sale intelligently with prospective purchasers, and told him that he wanted $650,000 for it. Continuing the witness said: "I told Mr. Stokes that I would look about for a purchaser. I did not know how soon I would get a purchaser; * * * I told him I was a busy man myself, but I would make a strong effort to get somebody to buy the hotel if I possibly could. * * * I do not remember his exact language, but it was agreed between Mr. Stokes and myself that I was to get the usual commissions allowed by real estate men, two and one-half per cent. on the sale if consummated." He was then asked: "For what were you to receive this two and one-half per cent. commission?" And replied: "When I got a purchaser to buy the Caswell Hotel from Mr. Stokes I was to receive two and one-half per cent. commission. That was to be the fee or the commission, just as you chose to use the word, for the effort I was putting forth to locate a customer." He further testified that he finally interested a Mr. Joel Gephard, who was a "part owner in the Victoria Theatre and other large

properties around Baltimore," in the property, and brought about an interview between him and Mr. Stokes. This interview took place either at the store of Mr. D. Clifford Mansfield, on Fayette Street, or at the witness' office. That at that interview Mr. Stokes and Mr. Gephard, in the presence of Mr. Mansfield and Mr. Wolf discussed "the purchase by Mr. Gephard of the Hotel Caswell." That the appellant had asked $650,000 for the property, but Gephard did not want to give that much money for it. That there was "considerable talk and bickering back and forth," and that Mr. Stokes and the witness were trying to convince Mr. Gephard that it was really a valuable property and what possibilities it had. That during this interview, which lasted an hour to an hour and a half, in addition to the technical details of the construction and operation of the hotel and the purchase price, they also discussed the time and terms and manner of payment. That this interview terminated without any agreement between the parties. To quote the witness: "They were unable to get together on the price at all. Mr. Gephard thought that $650,000 for a small hotel in war time and under war-time conditions was a very large price. Mr. Stokes, on the other hand, while he said he was anxious to sell it, did not feel that he could take less than $650,000, and there the first conference, as I remember it, broke up." That after this occasion the negotiations continued until November or December, and during that period there were numerous interviews either at the office of the appellee or at the Seth-Hopkins-Mansfield store on Fayette Street, and that "in the course of the negotiations Mr. Mansfield (who was acting as a friend of Stokes, but had himself only a nominal interest in the property) and Mr. Stokes had agreed to take less than $650,000, and Mr. Gephard in turn had raised his price. That for a long time they were getting together, but had not actually closed the deal, but that as a result of the offer and the counter propositions on both sides a price was finally reached at $615,000."

That at the time these efforts were being made to sell the hotel it was under a lease to Mr. Busick, and the effect that this lease and Mr. Busick's possible attitude towards the purchaser might have on the property was a matter of much concern to Mr. Gephard, but that Mr. Stokes met this objection by suggesting that the appellee go to see Mr. Busick about his lease, and that he in reply to this suggestion said: "If I would go to see him, he being in possession of the place, he is going to run right to you, and that means that it will be Busick instead of Gephard and O'Hara." Continuing, the witness said: "Mr. Stokes each time would indignantly deny it, and he said under no circumstances could Busick have it—that no matter who got it Busick could not have it." That that assurance had been given a great many times. "And each time, as I told you, the same indignation would be displayed, or the seeming indignation, by Mr. Stokes, and in the presence of Mr. Mansfield, Mr. Gephard and myself, and Mr. Mansfield would always say, 'Yes, that is right, that is right,'" and so the matter was finally closed, the price agreed upon, at $615,000. That on the occasion of this interview Mr. Stokes called the witness aside and they talked the sale over. That the witness told him there would be no trouble in selling the hotel to Gephard, but that Gephard was worrying about the Busick lease, which had a year and seven or eight months to run; that Mr. Busick could close the place up, which would mean that it would be "practically dead to the business world." That Mr. Stokes then said to the witness: "You take my word that Busick could not have it under any circumstances, and you go talk to Mr. Busick and tell Mr. Busick and I assure you that Mr. Busick cannot have it." That on the last occasion at which the matter was discussed the witness said "Mr. Stokes, I will go, but mind you now you mean what you say," and he said, 'I will give you my hand. * * * It is all right Busick cannot have it,' and I said to Gephard, 'what about it?' And Mr. Gephard said, 'You go ahead, Mr. Stokes has given his word and his

word is good; he has given you his hand on it; it is all right.' "

That at some time during the negotiations and before the sale was agreed upon, Mr. James F. O'Hara had been taken into the transaction by Mr. Gephard, so that while the earlier negotiations were apparently conducted by Mr. Gephard on his own behalf, towards its close he was acting for himself and Mr. O'Hara jointly.

The witness further testified that the "bargain was finally closed except the signing of the papers" and the names of the purchasers, James F. O'Hara and Joel Gephard, were disclosed to Mr. Stokes, and, to again quote the witness: "The matter was closed on Fayette Street; Mr. Gephard and Mr. O'Hara were the purchasers of the property for $615,000." That "the price had been accepted by Mr. Gephard on behalf of himself and Mr. O'Hara and it was $615,000," and that it was not until the "sale had been actually closed" to Gephard and O'Hara that the witness did go to see Busick. That the terms of sale as stated to the witness were as follows: "The only amount to be paid when the transaction was finally closed was the amount he had always been asking twenty-five thousand dollars, and the balance was to be accepted by way of mortgage. The closing price was $615,000 and this Mr. Stokes accepted and Gephard and O'Hara agreed to pay." That after this oral agreement was reached Mr. Stokes was to see his own lawyers to have them prepare a formal contract of sale between him and Messrs. O'Hara and Gephard as the purchasers.

That at the time this agreement was reached the appellee agreed with the appellant to accept $15,000 in lieu of the two and one-half per cent. mentioned in his original contract of employment. That notwithstanding this agreement Mr. Stokes failed to submit the formal contract of sale to the purchasers, and the appellee at their request repeatedly either saw or spoke to him over the telephone about it. That Mr. Stokes gave a number of excuses for the delay and finally

said that he had been advised by his bankers that the cash payment of $25,000 was not large enough, but that he wanted $40,000 in cash, and that the witness thereupon saw Gephard, who at his instance agreed to this change. That there was then another conference between Gephard and Stokes, at which this modification was agreed to, and that Mr. Stokes then said he was satisfied and would go down and get the lawyers to prepare the contract, but that he again failed to submit to them any formal contract of sale, but finally sold the property to Busick. The witness further testified that the proposed purchasers were "ready, willing, and able to make the purchase of this property on the terms suggested by Mr. Stokes." On his cross-examination the witness said that James F. O'Hara was interested in the Bowie Race Track and five other race tracks, and that Mr. Gephard owned or was interested in several theatres in Baltimore.

Joel Gephard, the only other witness for the appellee, testified that Mr. Wolf had asked him to buy the hotel, and that after that he went over the property very carefully five or six times; that he met Mr. Stokes at Mr. Mansfield's store and discussed with him the purchase of the property, and on that occasion offered $575,000 for it, but that this offer was declined; that after that he had another interview with Mr. Stokes at which he and O'Hara "bought" the property for $615,000, and that he and O'Hara were ready, willing and able to carry out the arrangement finally made for the purchase of the property; that he was financially able to do so and from what he was told O'Hara was also. On cross-examination the witness added that his property consisted of stocks and bonds, a lot back of the Victoria theatre which sold for $27,000, a third interest in the Victoria theatre and a one-half interest in the Clover theatre.

William P. Farrell, a witness called for the defendant, testified that he was the manager of the Southern Hotel in Baltimore, and before that he was a clerk at the Hotel Belvedere; that it was he who took Mr. Stokes and Mr. Mansfield

to Mr. Wolf's office; that he did that because Mr. Wolf had been talking with some friends of his some time before and they had told him that if he found "anything good in the hotel line" they would "back" him and "get in" with him; that at the interview at appellee's office Mr. Wolf said to Mr. Stokes, "I think Farrell has some friends that are anxious to get into the hotel business with him in case we find something good," and Mr. Stokes replied, "I am very glad to hear that; I would like to see Farrell get hold of this hotel, because I do not think there is anybody that would treat it better than he would," and that the price, $650,000, was discussed, and it was intimated that some reduction in that amount could be made; that the witness finally announced that he had to leave, and that Mr. Stokes then said, "All right, we will just leave this with Mr. Wolf and he will attend to this, he will look after this now, and I am pretty sure that he has got a customer"; that he had talked with Mr. Wolf before about the purchase of a hotel; that there was an understanding between him and Mr. Wolf as to who the purchasers would be but that he knew Mr. Wolf was not buying it for himself but for other men. On his redirect examination the witness said he had told counsel for the appellant that "they" (presumably referring to Wolf's friends, who were looking for a hotel for Farrell), had not empoyed Mr. Wolf on a commission.

Harry Busick testified that he had been in the hotel business about fifteen years, and that he operated the New Howard and the New Condon Hotels in Baltimore, and that he acquired the Caswell in January, 1918, for $600,000. He further testified that the appellee had approached him on one occasion and told him that he, the appellee, was about to buy the hotel and wanted some information concerning the witness' attitude towards the purchaser; that he told the appellee he would do nothing to jeopardize his or any other person's interest; that there were two interviews about the same matter and that the last one was possibly on the 22nd or

23rd of December, 1917; that some time after Christmas he met Mr. Stokes and said to him, "I understand you have sold the hotel," and he replied, "No, I have not sold the hotel," and that then he began negotiations for its purchase; which were consummated in an agreement executed on January 26th, 1918, for the sale of the property to Busick for $600,000, of which $55,000 was to be paid in cash.

D. Clifford Mansfield testified that Mr. Wolf was introduced by Mr. Farrell to Mr. Stokes "as a gentleman who was going to buy the property for him"; that he was present at the first interview between them and nothing was said about the payment of commissions to Mr. Wolf, but that Wolf was trying to buy the property for himself, and offered a farm he owned at Bay Shore in part payment; that nothing was said by Wolf about "Mr. Stokes employing him to find a purchaser"; that he first met Mr. Gephard at his, the witness' store, where he was introduced to Mr. Stokes by Mr. Wolf, as "Mr. Gephard, the man who looks after my property"; that at that interview various details in connection with the construction and operation of hotels were discussed but nothing was said about Mr. Gephard purchasing the property; that the name of Mr. Gephard as a possible purchaser for the property was never mentioned at any one of the interviews at which he was present, and nothing to his knowledge was said about any purchaser except Mr. Wolf, that the witness had never heard of the price of $615,000 mentioned before the trial of the case.

Sylvanus Stokes in his own behalf testified that he resided in Washington, D. C., but was then engaged in remodeling a hotel in Boston, where he had been since April, 1919; that he first went into the hotel business in 1899 at the St. James Hotel in Baltimore, and that since then he had been connected with the operation, construction or development of hotels in Baltimore, Boston, Norfolk and New York; that after the Baltimore fire he built the Caswell Hotel, which he at first operated himself but later leased for short terms

to different tenants and finally to Mr. Busick, its present
owner. That he learned from Mr. Farrell that the appellee
was interested in buying the hotel, and he accompanied Mr.
Farrell to the appellee's office, where Farrell introduced him
to Mr. Wolf in the following manner: "Mr. Wolf is going
to buy this hotel for me, and I have brought you here to see
if he will not be interested in purchasing this hotel for me."
That he did talk over with Mr. Wolf the sale of the hotel to
him, and named its price, which he afterwards reduced; that
Mr. Wolf wanted him to take his farm at Bay Shore in part
payment but he declined; that he did not employ Mr. Wolf
to find a purchaser, and did not agree to pay him commis-
sions. He further said that he did not know Mr. Gephard
as a bidder for the property, and that nothing was said by
Mr. Wolf to indicate that any one other than himself was
buying the property; that he had named a price of $630,000
to Mr. Wolf and that it was acceptable to him, but that not-
withstanding the price named was satisfactory to the parties,
the sale was not consummated, although they had numerous
interviews in regard to it. That at one of these interviews
Stokes told Wolf he would not lower the price any further,
and Wolf then said "anyhow there ought to be a commission
allowed me," and the witness replied, "I told him I would
not do it, that I had given him the lowest price, that I had
taken twenty thousand dollars off the price I wanted, and I
would not make any further concessions; that the last time
he saw Wolf about the purchase of the hotel was on the 2nd
of January, 1918, when, to quote the witness: "We drifted
into the conversation again as to the sale of the property, and
there was a piece of paper or pad lying there, and he put
down $615,000." He said, "that is all it is worth; that is
all I ought to pay for it. It is worth no more than that."
That was the first time that price had been named; that he
asked Mr. Wolf to put this offer in writing, but he declined
to do so. In his cross-examination the witness testified that
at the time this offer was made he told Mr. Wolf he would

not accept it, and that later he wrote to him asking that it be put in writing; that on January 3rd or 4th he saw Mr. Busick, who "had known for some time that he could get the property," and asked him to submit an offer in writing for it; that he did submit an offer of $600,00 which was accepted. The witness explained that he had not accepted Mr. Wolf's offer because terms were not stated, but he also said that they did not discuss the terms because he would not accept the offer of $615,000.

This is substantially the testimony relating to the appellee's right to the compensation he claims. There is other testimony in the case affecting the credibility of the witnesses or the weight of their testimony, but as a consideration of it is not essential to the determination of the questions presented by the appeal, it would be needless to prolong this opinion by any discussion of it.

The plaintiff offered one prayer, which was granted, and the defendant seven, of which four were granted and the others refused. The plaintiff's prayer, in our opinion, correctly states the legal principles controlling his right to recover in this case. The defendant's first prayer, which was refused, was the usual demurrer to the evidence. His "A" prayer, which was refused, was to the effect that there was no evidence legally sufficient to show that both the alleged purchasers "were ready, able and willing" to purchase the property on the terms testified to by the appellee, and his "B" prayer, which was also refused, instructed the jury that there was no legally sufficient evidence that the appellant had ever agreed to accept Gephard and O'Hara as purchasers of the property, and that therefore their verdict should be for the defendant. The defendant also specially excepted to the plaintiff's prayer on the ground that there was no legally sufficient evidence that the defendant had agreed to a sale to the purchasers referred to therein, or that he was ever given an opportunity to complete the sale to them. This exception was overruled, as was a motion to strike out the evidence,

the testimony of Wolf and O'Hara, "upon the question of whether or not James F. O'Hara was ready, willing and able as one of the alleged purchasers to purchase the property in the proceedings mentioned, for the price and on the terms testified by the witness Wolf." The rulings of the court upon these several matters are the subject of a single bill of exception, the eighth. This Court has repeatedly disapproved the practice of embodying in the same exception rulings of the court on several and distinct matters, and in *B. & O. R. R. Co.* v. *Reuter,* 114 Md. 700, it was said, "as the rulings on the prayers may be regarded as a single act, and may be embraced in one exception, where exceptions to other rulings are included in the same bill of exceptions, they cannot be treated as valid exceptions, and only the exception to the rulings on the prayers will be considered." This rule was approved and followed in *Harris* v. *Hipsley,* 122 Md. 436, and must be regarded as controlling here, and for that reason the court's ruling on the motion to strike out the testimony of Gephard included in the eighth exception will not be considered, but the exception to its rulings on the prayers and the special exception will be treated as valid.

All of these rulings rest upon the assumption that the appellee offered evidence legally sufficient to support the averments of his declaration, and the soundness of this assumption and the propositions of law subsidiary thereto will now be considered.

The general rule relating to the plaintiff's right to recover under the circumstances of this case has been often declared and is very clearly stated by JUDGE STOCKBRIDGE speaking for this Court in *Bethlehem Steel Co.* v. *Dornberg,* 135 Md. 125, where it is said: "The law governing the rights of real estate brokers to commissions on a purchase or sale is thoroughly well settled both in this State and elsewhere. To entitle a broker to commissions it is not required that the actual contract shall be made, or the purchase consummated by him; it may be done by his principal, or one duly author-

ized to act for such principal just as well. What is required is that the broker shall fully discharge his duties and perform all that he undertook to do. If he does that he is entitled to compensation irrespective of whether his services were beneficial or of value to his employer. *Parker* v. *Power,* 127 Md. 598; *Glenn* v. *Davidson,* 37 Md. 365; *Kimberly* v. *Henderson,* 29 Md. 512; *Schwartze* v. *Yearly,* 31 Md. 270."

The question then is: did the appellee "fully discharge his duties and perform all that he undertook to do." The appellant contends that the court must assume that he did not, because the evidence in the case is not legally sufficient to show (1) that there was a meeting of the minds of the seller and proposed purchasers; (2) that O'Hara (one of the proposed purchasers) was ready to buy the property or that any one had any legal authority to act for him in regard to the contract of sale; (3) that the purchasers were financially able to comply with the terms of sale; (4) that the appellee was employed to procure purchasers at $615,000, and because the appellee's conduct, if he was Stokes' agent, "debars him from recovering compensation as such." Taking these objections in the order in which they have been stated here and considering the first two together, there was in our opinion sufficient evidence to go to the jury on the question of whether Stokes ever agreed with Gephard and O'Hara to sell his property to them, and whether in making such agreement Gephard was authorized to speak for O'Hara.

It would be needless to prolong this opinion by again reviewing in this connection the testimony which has already been set forth at some length, further than to say that there is direct and positive evidence in the case that the appellant orally but definitely agreed to sell the property to Gephard and O'Hara for $615,000, of which $190,000 was to remain in a first mortgage then on the property; $25,000, later increased by consent of the parties to $40,000, to be paid in cash, and the balance to remain in a second mortgage payable

over a period of twenty years at five and one-half per cent. interest. The appellant and witness Gephard both testified that the seller and the proposed buyers did reach an agreement upon the basis of these terms and since the legal sufficiency of the evidence is in issue, the truth of that testimony must be assumed. If therefore the appellant agreed with the proposed purchasers upon the property to be sold, the persons who were to buy it, the price to be paid for it and when and how it was to be paid, nothing remained to be done by the appellee, for he had fully discharged his duty. It was suggested that the evidence does not show in sufficient detail the terms of the first mortgage or that the purchasers ever assumed its payment, but as it is clear from the evidence that the purchasers knew of this mortgage what its terms were was not material since they had with such knowledge assumed its payment. Gephard was asked in connection with it this question: "As I understand it the balance, the difference between the mortgage on the property and the $25,000 that you were to pay, the difference was to be covered by a second mortgage," and his reply was ,"Yes." It cannot be said therefore, that there was no evidence in the case legally sufficient to show that there was a definite agreement as to the sale of the property and the terms thereof between the seller and the proposed purchasers.

Nor can the fact that this agreement was oral and not written avail to defeat the appellee's claim, if, after having agreed orally to the sale, the appellant, without any sufficient cause, refused or neglected to execute a written contract embodying the terms of the oral agreement which the purchasers were willing to execute. The rule that a broker employed to sell real estate is not entitled to commissions until the sale is consummated by the execution of a contract enforceable at law is not applicable under such conditions, and this distinction is clearly pointed out in *Riggs* v. *Turnbull,* 105 Md. 150, in which it was said: "In *McGavock* v. *Woodleaf,* 20 Howard, 229, cited in 29 Md. 515, the Supreme Court said:

'The broker must complete the sale; that is, he must find a purchaser in a situation, and ready and willing to complete the purchase on the terms agreed upon, before he is entitled to commissions. Then he will be entitled to them though the vendor refuse to go on and perfect the sale.' Mr. Benjamin appeared in that case for the defendant, the plaintiff in error and one of his propositions, apparently approved by the court, was that it was necessary for the broker to show 'that the sale was actually made, and the price received, or at all events, that it was his employer's own fault that the sale was not effected.' " And in *Coppage* v. *Howard,* 127 Md. 522, JUDGE THOMAS, speaking for the court, after a very careful review of the authorities, said: "It is clear upon the authorities referred to that to entitle a broker employed to sell or find a purchaser of real estate to recover commissions, where no contract of sale is executed by his employer and the purchaser, it is incumbent upon him to show not only that he procured a person who was ready, willing and able to purchase the property upon the terms authorized by his employer, but also that his employer was advised of that fact and given an opportunity to complete the sale to the proposed purchaser, and that the sale was not consummated because of his employer's default."

There is also some evidence in the case tending to show that in making this agreement Gephard was authorized to act for O'Hara. The appellant did not question his authority, at the trial, to so act, but on the contrary appears from the plaintiff's testimony to have conceded it, since he agreed with Gephard to sell the property to him and O'Hara, and he never did refuse to sell the property on the ground that Gephard was not authorized to speak for O'Hara, nor did the sale fail because O'Hara refused to execute a formal agreement, but because Stokes would not do so. Gephard and Wolf both testified that Gephard and O'Hara were ready, able and willing to carry out the agreement finally reached for the purchase of the property, and Wolf testified that

Gephard told Stokes he had full authority to speak for O'Hara, and that O'Hara was satisfied with the arrangements made, and he also said that O'Hara left the actual negotiations to Gephard. This testimony is neither full nor satisfactory, but it does afford some evidence of Gephard's authority to speak for O'Hara, in view of the unqualified statements that both O'Hara and Gephard were willing to carry out the agreement made by Gephard with Stokes, and there was therefore no error in the submission of that question to the jury.

The next objection is that there is no legally sufficient evidence to show that the proposed purchasers were financially able to perform the contract. This objection presents a purely academic and abstract question which, under the circumstances of this case, need not be considered in connection with the parties under consideration. Assuming that the facts were as stated in the testimony tending to support his claim, the appellee had procured two persons as purchasers for the appellant's property who definitely and finally agreed orally to buy it from him, and who agreed with him upon the terms of sale, the price to be paid and other details connected with the sale, and the appellant had accepted these two persons as purchasers, and agreed to execute a formal written contract of sale embodying the terms agreed upon, but he later refused to execute the contract, without assigning any reason for such failure, and actually sold the property to another person. Under such circumstances the burden was upon the employer to show that the proposed purchasers were not able to buy the property and not upon the broker to show that they were. *Dolson* v. *Milliken,* 27 App. D. C. 500, 209 U. S. 237; *Phinizy* v. *Bush,* 129 Ga. 479; 4 *R. C. L.* 309; 29 *L. R. A.* 216, and the appellee was not therefore required to show the financial ability of the purchasers, although there was some evidence as to that of Gephard, who as one of the joint purchasers would have been individually liable for the performance of the terms fixed by the contract

of sale, as "it is incident to every joint contract that all are bound to its performance," 6 *R. C. L.* 879.

The testimony as to O'Hara's financial ability, it is true, is vague and incomplete and of doubtful validity, but in view of Gephard's ability to carry out the contract and of the fact that Stokes actually accepted O'Hara and Gephard as purchasers satisfactory to him and then without questioning their financial ability, for reasons not disclosed to them, refused to consummate the sale, the objection presents a question which obviously is immaterial and which need not be further considered.

The objection that the evidence does not show that the appellee was employed to procure a purchaser at $615,000 is also without force. The testimony was that when Wolf was employed he was told that his employer wanted $650,000, but that this price could be reduced and that amount was named tentatively and not as a conclusive or final selling price, and later on his employer did agree to sell it to persons brought to him by the appellee for $615,000. Wolf was not employed to procure a buyer who would pay $650,000 for the hotel, but to procure a purchaser who would buy it at a price fixed by and satisfactory to his employer. Under such circumstances it cannot be seriously contended that he was not employed to sell the property for the amount which his employer agreed to accept for it.

It is also urged that the case should have been taken from the jury on the ground that the appellee, even if he had been employed by Stokes, also and without the appellant's knowledge, in negotiating the sale, acted for the proposed purchasers. If that were true manifestly the appellee could not recover in this action. *Raisin* v. *Clark,* 41 Md. 158; *Schwartze* v. *Yearly,* 31 Md. 270; *Blake* v. *Stump,* 73 Md. 172; *Slagle* v. *Russell,* 114 Md. 427, but the contention is not supported by the evidence and does not appear to have been made at the trial, and was apparently an afterthought which had never occurred to the appellant prior to the ver-

dict. It is based mainly on Wolf's efforts to have his employer sell the property to Gephard and O'Hara rather than to Busick, and because Wolf referred to Gephard and O'Hara as his clients. But there is not the slightest evidence that Wolf was to receive or did receive any compensation or reward from them for purchasing the property or that he was employed by them in the transaction. He disclosed their names to his employer and kept him informed of the negotiations between him and them. It was not unnatural that he should have desired his employer to sell the property to a purchaser procured by him rather than to one procured by the employer, since in the one case he would receive his commissions and in the other he would not. But this was apparent and known to his employer and if he felt that his employee's interest in his own commissions affected his fidelity to his employer's interest he should at once have terminated the employment, but as he did not do that, but with full knowledge of the circumstances to which he now refers, retained the appellee in his employment, he cannot now be permitted to complain. Nor can any conclusive significance be attached to the fact that the appellee referred to the purchasers as "his clients." According to the testimony of one of the appellant's witnesses, the appellant approached Wolf in the first place and employed him because he had been told that Wolf had friends, who may well have been clients, who might buy the property, and if that is true and we cannot assume that it is not true, he at least cannot now be heard to complain that because his employee did what he was employed to do and sold the property to his own clients that he is not entitled to compensation, because the purchasers were his clients, in the absence of any evidence to show that they were his clients in regard to the particular transaction.

For the reasons stated, there was, in our opinion, no error in the rulings of the lower Court in regard to the prayers.

This brings us to a consideration of the exceptions relating to the evidence, which may be briefly disposed of. The sec-

ond, third and fourth exceptions relate to the admission of testimony by the appellee to the effect that the proposed purchasers were ready, able and willing to buy the property and the sixth exception to the admission of the testimony of Gephard to the same effect. In view of what has been said, there was no reversible error in these rulings, since, under the evidence supporting the plaintiff's contention, it appears that the appellant, after having accepted the proposed purchasers procured by the appellee, prevented the consummation of the sale by his own default, and thereby prevented them from demonstrating their readiness, ability and willingness to comply with the terms of sale.

The remaining exceptions were not seriously pressed, and we have discovered no error in the rulings to which they relate.

For the reasons given the judgment of the lower Court will be affirmed.

*Judgment affirmed, with costs.*