## HOWARD C. BREGEL *v.* PHILIP B. COOPER.
### [No. 6, October Term, 1931.]

*Decided December 26th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Eldridge Hood Young,* with whom were *John D. C. Duncan* and *Young, Crothers & Settle* on the brief, for the appellant.

*Charles B. Bosley,* for the appellee.

SLOAN, J., delivered the opinion of the Court.

The appellee, Philip B. Cooper, had an option on a lot in Annapolis, which he intended to buy for the purpose of erecting thereon an apartment house. He had to raise the money to finance the operation and, through a mutual friend, was introduced to the appellant, Howard C. Bregel, a member of the Baltimore bar, who "accepted his application and in due course made application for Mr. Cooper and in behalf of Mr. Cooper to the Real Estate Trust for the loan." Mr. Cooper owned a dwelling house at Wardour, near Annapolis, which he proposed to convert into several apartments. To finance both operations would require $125,000, of which $15,000 was to be used on the Wardour house.

The appellant, on the theory that he had produced a lender who was ready, willing and able to make the loan (*Coppage v. Howard,* 127 Md. 512, 96 A. 642), sued the appellee for compensation for his services, and it is from a judgment adverse to his claim that this appeal is taken. There was included in the suit a bill for services in the examination of the title, which will be discussed farther on.

The appellant took the appellee to the office of the Real Estate Trust Company, where he was introduced to Milton C. Roberts, its president. This was the first of several conferences in which the appellant, appellee and Mr. Roberts participated. Robert S. Cooper, son of the appellee, was present several times, and was as active and apparently as much concerned as the father. The appellee testified that the son "co-operated in this business."

Mr. Roberts testified that "there were several interviews, culminating in a conference with both the Coopers in the

office of Mr. Burnett, the president of the Mutual Life Insurance Company (which was to take over eighty per cent. of the loan), at which time all of the details were gone over and acted upon, and all the details were gone into at that time and culminated in a letter from me to Mr. Bregel in which the proposition was stated." On April 10th, 1929, the letter about which Mr. Roberts testified was written to the appellant, wherein it was stated that "the Real Estate Trustee, Inc., will place for your client's account a mortgage of $110,000.00 to run for a period of ten years on the Annapolis lot, to contain reduction clauses as set forth in the memorandum accompanying Mr. Cooper's letter of April 9th." Robert S. Cooper had made up two plans, one for the amortization of a loan of $125,000 and one for a loan of $110,000. The appellee's plans contemplated the conveyance of the Annapolis lot to a corporation, which was to execute the mortgage and to provide for the additional funds required through the issue and sale of stock. It was "to be a condition precedent to the making of the loan that a satisfactory surety bond for the completion of the building be given and placed through this office and a certain fixed sum is to be withheld for final payment until the building is ready for occupancy and a certificate to that effect is furnished by Foster F. Fenton, representing this company. This may be provided for in the bond of completion or by the deposit with the Real Estate Trust Company of the sum agreed upon." "It is further understood and agreed that the building will be constructed according to plans and specifications to be approved by us, which are supposed to be similar to those heretofore submitted." Mr. Cooper (appellee) is an architect. "The expenses incidental to the financing will be $11,000, which shall include title fee, and the title shall be subject to the approval of our attorney." The concluding paragraph of the letter was: "Inasmuch as I expect to be out of town for the balance of the month, you may consider this authority to examine the title if your clients accede to the above terms. However, before proceeding it will be necessary for you to submit the plans and specifications covering

the proposed building on the site above referred to, to Mr. Fenton for his approval."

Mr. Roberts testified that "this letter was the culmination of the negotiations, that it represents what has been agreed upon between Mr. Cooper and myself at the various interviews and this letter is of course written to set forth those terms and a letter of this kind is never written unless the mortgage terms have been agreed upon and accepted by the mortgagors, the proposed mortgagors." "That letter was the culmination of all these negotiations and Mr. Bregel received his authority evidently for his services to proceed, but that letter was to Mr. Bregel as attorney for the Coopers and it was the culmination and there is no doubt at all as far as Mr. Cooper and myself were concerned that the apartment was to be constructed upon the terms agreed upon between us and I wrote the letter to Mr. Bregel accepting them with the terms which must necessarily be left open for the final settlement of the mortgage transaction when the property is transferred and all done to our satisfaction."

The appellant's testimony was substantially the same as Mr. Roberts', with the addition that the original plans and specifications had been submitted to Mr. Fenton. He testified that "Mr. Cooper said he has been working on the plans and specifications for the new plans," but they had not been approved "because the settlement never went through." The appellant testified that he read the letter of April 10th to the appellee, and forwarded it to his son, Robert S. Cooper. The son wrote the appellant on April 13, 1929, beginning, "I think that terms mentioned therein are satisfactory," and then went on to discuss some details which appeared to have been left open by Mr. Roberts' letter of the 10th, though both the appellant and Mr. Roberts testified that everything which could be definitely settled at that time had been agreed upon. There is evidence also that the appellee had urged the appellant to search the title without delay, and had furnished, through his attorney at Annapolis, some title references to the lot on which the apartment was to be erected, and that the appellant had promptly done that part of the work, and

had so informed · the appellee and the Real Estate Trust Company.

These are substantially all the facts upon which the appellant relies for the, recovery of compensation for his services in procuring a loan for the appellee. *Stokes v. Wolf,* 137 Md. 393, 112 A. 566; *Warshawsky v. Traub,* 156 Md. 597, 603, 144 A. 833, and cases there cited. These are cases of sales of real estate, but "the rights and duties of a broker employed to secure a loan depend in general upon the same principles which govern the broker who undertakes to find a purchaser of property. The loan broker is entitled to his commissions where he has procured a lender who is ready, willing and able to lend the money on the terms proposed." 2 *Mechem on Agency* (2d Ed.), sec. 2467.

The appellee's contention is that the appellant could not claim compensation because "there was no valid, binding or enforcible written contract entered into between the trust company and the defendant (appellee) whereby it obligated itself to make a loan to the defendant." In other words, the appellant would have no standing in court unless he brought the parties within the provisions of the Act of 1910, ch. 178, Code, art. 2, sec. 17. But this court in *Navarre Realty Co. v. Coale,* 122 Md. 494, 501, 89 A. 728, declared that that act has no application to such a case as this.

The proposed loan would probably have been made and the mortgage executed if an opportunity had not presented itself to the appellee to make an advantageous sale of the lot on which the apartment house was to have been erected. Of that Mr. Roberts testified that the appellee came to him and said: "He had an opportunity of turning it over at a profit—I think he said at first of $10,000.00, and he asked what my attitude in the matter would be—what my advice would be. * * * There were two or three visits of Mr. Cooper relating to the matter and the question of our fees was discussed, and he asked what my attitude on that would be and I told Mr. Cooper very frankly if we did not advance the money we would not expect him to pay any portion of the commission charges that might come to us, but I thought we

ought to be reimbursed for any expenses we were put to, including the title examination and Mr. Bregel's charges, if he made a profit out of the deal." The appellant testified: "I certainly expected to be reimbursed for my services," and, "as to that," the appellee said, "that is all right; we will take care of you." The appellee did sell the lot, or assign his option, and the apartment house project was abandoned.

There can be no doubt that the appellant did render the appellee valuable services in a matter to which he gave considerable time and labor, but whether he fortified himself so as to be in a position to demand pay for his services, regardless of the outcome, or waived his right to compensation, are the questions we have to decide.

There does not appear in the record anything showing a demand in terms on the appellee by the appellant, or any understanding to this effect. If nothing at all appeared in the record except what has been stated, the appellant would have produced legally sufficient evidence of his right to compensation from the appellee on a *quantum meruit*. *Calvert v. Coxe,* 1 Gill, 95, 116,124; 2 *Mechem on Agency* (2nd Ed.), sec. 2245; 6 *C. J.* 724. In the letter of Robert S. Cooper of April 13th, 1929, he says: "Am I not correct in assuming that the only expenses incidental to the financing, legal or otherwise, will be $11,000, or ten per cent. of the principal amount of the loan? This, of course, does not include the bond of completion and necessary forms of insurance." This indicates what was in the mind of Robert S. Cooper, who was as much concerned as the father, for whom he was also writing. They wanted to know where they stood, and that was the time for the appellant to speak. It was the request of a client for information, and it was the duty of the agent or attorney to inform the client. If he had then advised them that he expected to be paid for his services in procuring the loan, they would have found it difficult to escape liability, whether they went on with the matter or not. The first place we find an answer to it in the record is where, on cross-examination of the appellant, the following appears: "Q. Don't you recall one letter Mr. Cooper wrote you saying he

accepted the loan on certain conditions? A. That is right. Q. That the $11,000 was to include all expenses outside attorneys? A. That is right. Mr. Cooper knew there was an agreement to be a flat charge of $1,000 as attorney's fees."

The appellant, after the negotiations for a loan had been dropped by the appellee, demanded compensation for his services, but there is no evidence in the record that he had made demand, before suit was brought, for anything except a fee for the examination of the title to the lot on which the mortgage was to have been placed, and then the demand was on behalf of the lender.

The authority of the appellant to examine the title was contained in Mr. Roberts' letter of April 10th, 1929, wherein he said, "You may consider this authority to examine the title if your clients (the Coopers) accede to the above terms." It appears that the appellant had also been engaged by Mr. Emmons, the trust company's counsel, to make the examination. This, therefore, raises the question as to whose attorney, in the examination of the title, the appellant was. In the proposal contained in the letter of April 10th, 1929, it was stipulated that the financing charge, or discount, should be ten per centum of the loan, and that should include the title fee, which it appears from the evidence was to be $1,000. The letter does not say so, but the only inference to be drawn is that the whole amount of the expenses would be deducted from the gross amount of the loan and disbursed or applied by the mortgagee.

After the negotiations for the loan ended, the appellant demanded from the appellee and his son compensation for his services, without specifying the amount, and, meeting with no response, he wrote Philip B. Cooper, c/o Robert Cooper, on May 16th, 1929, a letter in which he says: "Enclosed you will find a bill relative to the charge of the Real Estate Trust Company for services rendered in the apartment house loan in Annapolis. I have taken the matter up with Mr. Roberts and he is insisting that we be paid one per cent. title fee on the amount of the loan applied for, to wit, $110,000.00," and with it inclosed a bill against Philip B. Cooper to "Howard

R. Bregel, Attorney, for Real Estate Trust Co." for $1,100.00 for "services rendered." He wrote Robert Cooper on May 23rd, June 6th and June 20th, in each instance demanding payment on behalf of the Real Estate Trust Company; and on June 26th wrote: "Unless I hear from you on or before Saturday, June 29th, 1929, it will be necessary to institute suit against you for the collection of moneys due the Real Estate Trust Company of Baltimore." Nothing further appears to have been said or done until September 8th, 1930, when Mr. Bregel brought suit in his own name against Philip B. Cooper for the recovery of brokerage and commission for obtaining a loan from the Real Estate Trust Company and for a fee of $1,000 for the search of the title of the lot which was to secure the loan. It is apparent, therefore, that the appellant, in his examination of the title, regarded himself as the attorney for the trust company up to the time the suit was brought, and this is the contention of the appellee also. If the appellant has recourse against any one for services rendered in the title search, it is against the trust company, though we do not so decide, and, if the appellee is indebted for the same item to any one, it would be to the trust company, and that question also we do not here decide.

At the trial of the case the plaintiff reserved four exceptions, three to the admissibility of testimony and the fourth to the refusal of the plaintiff's first and second prayers, to the granting of the defendant's second, third and fifth prayers, and to the overruling of the plaintiff's special exceptions to the defendant's fifth prayer.

The plaintiff's first prayer asked the submission to the jury of the appellant's claim for the "usual and customary" commissions for procuring the loan. In view of the appellant's admission while testifying, "Mr. Cooper knew there was an agreement to be a flat charge of $1,000 as attorney's fee," supported by his failure to ask anything more when making demand on the appellee for compensation, there does not appear to be any evidence of a promise of the appellee, either express or implied, to pay a commission or brokerage to the appellant for procuring the loan.

The plaintiff's second prayer required the jury to find "that a fee of $1,000.00 was to be paid by the defendant to the attorney selected by said Real Estate Trustee, Inc., for the examination." The trust company's letter of April 10th as to the charges said, "The expenses incidental to the financing will be $11,000, which shall include title fee," and there is nothing in the record as to any other understanding except testimony to the effect that the title fee would be $1,000 of the $11,000. The prayer does not, therefore, correctly state the fact. Inasmuch as the evidence offered by both sides is that the title fee was to be part of the lender's charge, the special exception to the second prayer was properly sustained and the prayer refused. From what we have said, it is apparent that in our opinion the defendant's first prayer, which was refused, should have been granted, and the defendant's second, third and fifth prayers refused. As the verdict was in favor of the defendant, the same end was attained as if the defendant's first prayer for a directed verdict had been granted, and the judgment appealed from will therefore be affirmed.

There were three exceptions to rulings on evidence, the first of which was proper, in that it excluded hearsay evidence. The second was improper because it permitted Mr. Roberts to testify on cross-examination to the amount of commission paid on a loan which had no relation to the case. *Calvert v. Coxe,* 1 Gill, 95, 116. It was harmless, however, in that it did not affect the legal sufficiency of the evidence of the plaintiff's (appellant's) claim. The ruling on the third exception was proper because it excluded a question from which liability was to be inferred from the fact that the Coopers had never made any denial to the appellant of their liability to him in response to his letters from May 16th to June 25th.

*Judgment affirmed, with costs.*