## PHINIZY *v.* BUSH.

1. The general rule is, that, where an owner of property employs a broker to procure a purchaser, in order to earn his commissions the broker must procure a purchaser who is able, ready, and willing to buy, and who actually offers to buy, on the terms stipulated by the owner.

2. Under the general rule stated above, ordinarily the burden of showing all the requirements recited is on the broker, in a suit by him for commissions. But if the customer procured by the broker is accepted by the principal, the burden will be upon the latter to show that such purchaser was not able to comply with the contract, if he relies on that defense.

3. Sometimes, under his employment, the broker's duty is not merely to procure a purchaser, but to perform some other agreed service within a reasonable time, or within a limited time. In such cases the general rule as to what is required of him in order to be entitled to commissions is modified accordingly.

4. A contract may be closed by a letter or telegram, and become binding. But if it is claimed that a seller has become bound by an acceptance of his offer by the buyer, such offer must be accepted unconditionally and without variance.

5. If a broker undertakes to accede to a modification of the contract contained in the offer of the seller, the latter may repudiate his conduct and decline to be bound, or he may ratify the act of the broker and be bound by the change.

6. If a seller has become indebted to his broker for a fixed amount of commissions, an agreement made afterwards to accept less than the amount of the debt, in discharge thereof, will not operate as an accord and satisfaction of such indebtedness, unless actually executed by the payment of the agreed amount, or the giving of additional security, or the substitution of another debtor, or some other new consideration.

7. But if a broker had a limited time within which to effect a sale, and failed to do so within that time, and the principal declined to be bound further by the offer, but subsequently the broker sought to have him again consent to make the sale, and, in order to induce him to do so, agreed to charge less commissions than those contemplated in the original authority, and thus procured the seller to consummate a sale, the commissions of the broker would be determined under the new contract as to them, and not under that originally made.

8. Generally the form in which an agent acts is immaterial. If the principal's name is disclosed, and the agent professes to act for him, it will be held to be the act of the principal.

9. An agent may expressly contract on his own credit, and be bound, even though his principal be known.

10. Omitting cases of contracts under seal, negotiable instruments, and those where there is an express declaration in writing of an intention and agreement on the part of an agent to be individually bound, usually where the agent contracts in his own name, but his principal is known,

the question as to whether the principal or the. agent individually is bound is one of fact.

11. The case was a close one on the evidence, and there were several inaccuracies in the charge which require a new trial.

Argued June 6,—Decided November 14, 1907.

Complaint. Before Judge Hammond. Richmond superior court. January 26, 1907.

Bush sued Phinizy for commissions as a broker, and recovered a verdict. A new trial was refused, and the defendant excepted.

A number of stockholders in the Augusta Railway and Electric Company entered into a pooling arrangement in December, 1902, not to sell their stock for less than fifty cents on the dollar of its par value. The firm of Martin & Bush were designated as trustees to carry out the plan. The firm was dissolved, and Bush alone continued to act. Phinizy had seventy shares of stock covered by the pooling agreement. Martin & Bush had a number of shares. Bush and Phinizy both continued to buy stock until each of them had quite a large number of shares outside of the agreement. Altogether Phinizy had 445 shares. The Augusta-Aiken Railway & Electric Company had purchased a majority of the stock in the Augusta Railway & Electric Company. Jackson was a director in the former company. Bush was a stock-broker. On November 7, 1903, Bush submitted to Phinizy, for his examination, the following letter:

"Augusta, Ga., November 7, 1903.

"James U. Jackson, Esq.,

"Dear Sir:—I hereby agree to give you the option of purchasing the stock of the Augusta Railway & Electric Company owned by me and represented by me as trustee, amounting to about one thousand shares, at the rate of fifty cents on the dollar, for each share of stock of one hundred dollars' value. This option shall extend six months, from January 1, 1904. This option may be renewed for six months from the date of its expiration, upon the payment of $1.75 per share. In the event this option is exercised, there shall be added to the price of fifty cents on the dollar a sum equal to interest at the rate of 7 per cent. per annum on the purchase-price of the said stock, and the said interest shall be calculated from the date of this option up to and including the date upon which it is exercised. There shall be paid for this option

the sum of $40,000 First Mortgage Collateral Trust bonds of the Augusta-Aiken Railway & Electric Company. In the event this option is exercised, and the stock paid for, said bonds shall be surrendered and returned to you. In the event this option is not exercised, the bonds shall become the absolute property of the stockholders of the Augusta Railway & Electric Company, whom I represent and whose stock is above referred to. Both the stock and the bonds referred to above shall be deposited in the custody of the Georgia Railroad Bank, or of the Equitable Trust Company, both of this city, as I may elect, to be held in trust for the owners of the stock, on which the option to buy is given.

"Very truly yours, Wm. E. Bush.

"In case any dividend is paid on the Augusta Ry. & Electric Co. stock during the life of option, such dividend shall be held by the trustee, and shall be paid over to the purchaser in case the option is exercised. W. E. B."

Whereupon Phinizy wrote Bush the following letter: .

" Augusta, Georgia, Nov. 7, 1903.

"Mr. W. E. Bush, City.

"Dear Sir:—I authorize you to sell for me three hundred and seventy-five shares of the Augusta Railway & Electric Company stock at 50 cents on the dollar, in accordance with a certain letter of even date, written by you to Mr. James U. Jackson. There is to be no attorney fees charged against me on these particular shares of stock. I am to pay, for your service in making this trade, the same amount per share that the other shareholders will pay you. You are authorized also to sell my seventy shares in pool on same terms, except as to attorney's fees. This authority is good for thirty days only, to expire December 7, 1903.

"Very truly yours, Leonard Phinizy."

Bush then delivered to Jackson his letter and also a letter stating that "In accordance with our conversation of this morning, I beg to advise you that the stock of the Augusta Railway & Electric Company represented by me and referred to in my letter of yesterday is as follows:" (Setting out the names and numbers of shares held by each owner). Jackson went ·North to consult his principals, and on November 17 he sent to Bush the following telegram: "New York, November 17th. Wm. E. Bush, Augusta, Ga. Consider negotiations closed. Meeting of Board called for

Saturday to ratify same. Keep strictly confidential." The bonds of the Augusta-Aiken Company were in the hands of trustees in Baltimore. They declined to certify such bonds for the purpose of buying an option, and Bush and Jackson had negotiations with a view to changing the proposed trade so as to sell the stock itself on a credit, with the bonds as collateral security. On November 21, 1903, the board of directors of the Augusta-Aiken Railway & Electric Company passed the following resolution: "Resolved, That Mr. James U. Jackson, in behalf of the Augusta-Aiken Railway & Electric Company, be authorized to negotiate the purchase of 1,154 shares of the capital stock of the Augusta Railway & Electric Company, represented by Wm. E. Bush, and such additional stock as may be acquired other than that held by the General Electric Company, upon the following terms: $50.00 per share, payable twelve months from January 2, 1904, for which the company will give its negotiable note with interest at the rate of seven per cent. per annum, secured by the collateral trust five per cent. bonds of this company at 40 per cent. of the par value of the same." On November 30, 1903, Bush wrote Jackson the following letter:

"November 30, 1903.

"James U. Jackson, Esq., City.

"Dear Sir:—In accordance with our conversation this afternoon, I beg to advise you that Mr. Leonard Phinizy, who owns 445 shares of the Augusta Railway & Electric Company stock, has positively declined to ratify any trade made for his stock along the line described by us, viz.: That a sale of stock be made outright to your company. That the company should give its note secured by the stock and certain number of bonds as collateral. Such a trade would be acceptable not only to me, but to all of the other stockholders whom I represent. I have endeavored to have Mr. Phinizy recede from his opposition, but ineffectually. I enclose you herewith a copy of the letter addressed to me by Mr. Phinizy on November 7th, authorizing me to make you a proposition contained in my letter of even date. As you will note from Mr. Phinizy's letter, I am authorized to make such a trade up to December 7th. In the event you find it possible to consummate the transaction along the line of my letter, I would respectfully suggest that you act very promptly, as my authority from Mr. Phinizy expires thirty days from that date, November 7th, and in

the event we do not trade with him now, I fear that I may not be able to do so later except for cash.

"Very truly yours, Wm. E. Bush."

On December 5, 1903, the board of directors of the Augusta-Aiken Railway & Electric Company took the following action, as shown by the minutes: "The proposition of W. E. Bush, for himself and his associates, to sell to the company their holdings in the capital stock of the Augusta Railway & Electric Company was again presented and fully discussed. Upon motion of Mr. Jackson, seconded by Mr. Rutherford, Mr. Jackson was authorized to send a telegram as follows: To Wm. E. Bush: 'We accept your proposition giving us option for twelve months, with interest at seven per cent. per annum from date option is signed until payment.'" On the same day, Jackson sent to Bush the telegram above stated. Also during that day Bush telegraphed to Jackson as follows: "Telegram received and we stand ready to close. When will you be home?" And Jackson replied: "Meet me my office Monday to close details." On the same day, Bush testified, he wrote to Phinizy enclosing a copy of the telegram from Jackson and of his reply. As to what transpired after that time, the evidence is very conflicting. Bush's evidence tended to show the following state of facts: He at once had his attorney and Jackson to begin the preparation of a formal contract carrying out the terms of the sale of the option, which would be satisfactory to Phinizy and to the company, on the basis of Bush's letter to Jackson of November 7. Jackson was willing to carry out the contract. Bush stated to Phinizy that the transaction was ready to be closed when they would sign the agreement. He went to Phinizy quite a number of times with memoranda of various kinds, embodying the provisions of the trade, but to all of them Phinizy would raise some objection,—not to the substance, but to matters of words and expressions. He did not retire from the trade, or express himself as dissatisfied with it, or as refusing to carry it out. On the contrary, he was profuse in his expressions of pleasure at the profits he was going to make. On the 16th of December Jackson was pressing Bush to know when Phinizy would carry out the trade. A memorandum of agreement had been prepared, and Bush took it to Phinizy and asked if the latter would approve it, saying that if so he would send it off to the company for signa-

ture.  Phinizy declined to sign the agreement or to approve it.
Bush asked him why, to which he replied simply that he would
not do so.   Bush produced the letters and telegrams, and asked
him to state in what particular the contract presented varied from
the trade made under his authority, the purpose being to send
the contract to the company for execution.   He did not dispute
the authority, but refused to deliver the 445 shares of stock un-
til Bush agreed to relinquish his compensation.   After some dis-
cussion, apprehending serious financial loss and liability on ac-
count of his agreement with Jackson if the trade should not pro-
ceed, Bush consented to leave the matter of his compensation to
the sense of right and justice of Phinizy, and wrote and delivered
to him the following letter:

                                            "December 16, 1903.
"Leonard Phinizy, Esq., City.

    "Dear Sir:—In the matter of the *proposed* sale of your Au-
gusta Railway & Electric Company stock, I beg to say that I am
willing so far as your stock is concerned to leave the matter of
my compensation to your sense of right and justice.

                                       "Yours truly, Wm. E. Bush."

    After that the contract was signed by Phinizy on December 28.
On January 2, 1904, the board of directors of the Augusta-Aiken
Railway & Electric Company passed the following resolution:
"Resolved, That the *proposed agreement* between this company
and Leonard Phinizy, for the acquisition of 445 shares of the capi-
tal stock of the Augusta Railway & Electric Company, be entered
into, and that the President and Secretary of this company be,
and they are hereby, authorized and directed to execute the said
agreement for and on behalf of the company, and to do all other
things that are necessary and convenient to carry out the terms
and conditions of the same."   The agreement was then signed by
it through its officers.   In April following, the option was exer-
cised and the stock was bought outright and paid for in cash.
The agreement which was signed provided for interest to run from
its date; that there should be paid for the option $18,000 in
bonds (covering the proportion which Phinizy's shares bore to the
entire shares sold) ; that within ten days from the execution of
the written contract, the bonds and stock should be deposited with
a named company; that any dividends declared should be paid to

Phinizy, but should be treated as a part of the purchase-money if the option should be exercised. The owners of stock, other than Phinizy, made a separate agreement for the sale of the stock, and this was also carried out and the stock paid for.

Phinizy contended, in brief, as follows: He had assisted in the effort to sell his stock, but several efforts to reach an agreement had failed. The authority to make the contract set out in his letter of November 7, 1903, was not carried out within the time limited, but had expired. He neither agreed to continue it nor waived any of the terms of his letter. On the contrary, after the failure of consummation by December 7, he distinctly informed Bush of his refusal to proceed and of the termination of negotiations. After that time Jackson negotiated with him with a view to making a different trade, but without success. On December 16 Bush came to him and again sought to negotiate with him in regard to his stock, saying, "I have got a trade now that will stick," and that the trust company had changed their minds and would now release the bonds to secure an option. At the same time he presented, for the approval of Phinizy, the written agreement which had been prepared. Phinizy demurred, but Bush urged him to "come back into the agreement" and sign the paper. Under the former negotiations he had heard that Bush intended to charge $3.25 on each share, though Phinizy had insisted that a meeting was to be called to fix the compensation. When he was urged to again make an agreement, he declined to do so until the question of compensation was determined. He told Bush that in no event would he pay more than $1 per share, and that he did not think he should pay anything, as he had himself aided in the efforts to bring about a sale. Bush offered to leave the matter of his compensation to Phinizy's sense of right and justice, and wrote and delivered the letter above quoted. Thereupon, under the terms of this letter, Phinizy agreed to proceed, and afterwards, on December 28, signed the contract, which was subsequently approved by the directors of the company and signed, and at a still later date carried out by the exercise of the option.

The jury found for the plaintiff the amount sued for, with interest. To a refusal of a new trial the defendant excepted.

*William H. Fleming,* for plaintiff in error.

*Lamar & Callaway,* contra.

LUMPKIN, J. (After stating the foregoing facts.)

William E. Bush sued Leonard Phinizy for commissions alleged to be due him as a broker, for services rendered by him in selling for the defendant 445 shares of stock in the Augusta Railway & Electric Company to the Augusta-Aiken Railway & Electric Company. The jury found in favor of the plaintiff $1,-446.25, besides interest. A motion for a new trial was overruled, and the defendant excepted. The motion contained numerous grounds, but, under the view we take, it will be unnecessary to discuss them in detail.

1-3. Where an owner of property employs a broker to procure a purchaser, the general rule is that, in order to earn his commission, he must procure a purchaser who is able, ready, and willing to purchase on the terms prescribed by the owner, and offers to do so; and the burden of showing this is on the broker if he sues to recover commissions. Civil Code, §3015. If the broker does this, and the sale is not completed solely through the fault of the owner or his inability to make a good title, he is liable for the commissions. *Doonan* v. *Ives*, 73 *Ga.* 295; *Davis* v. *Morgan*, 96 *Ga.* 518. So also if the owner interferes and makes the sale himself to the purchaser thus procured. *Gresham* v. *Connally*, 114 *Ga.* 906. And this is true even if he makes some modification in the terms. If, however, the customer procured by the broker should be accepted by the principal, the burden would be upon the latter to show that the purchaser was not able to comply with the contract. *Davis* v. *Morgan*, 96 *Ga.* 520, supra. If the duty of the broker, under his employment, is not merely to procure a purchaser, but also to do some other act, the broker suing for commissions, after showing his employment, must also show that he performed the obligations undertaken by him, unless performance was prevented by the fault of the principal. 19 Cyc. 278. We omit any discussion of questions of adoption by ratification of acts of an unauthorized person purporting to act as agent, or of intervention by the principal preventing the completion of performance by the broker within the time prescribed, according to the contract, because no such questions are presented here. If the thing to be done by the broker, whether procuring a customer or effecting the transaction, is limited to be done in a specified time, he must show that it was done within that

OCTOBER TERM, 1907. 487

time, or that the time was extended or the limitation waived; and if the owner had ceased to be bound, by reason of the terms of his contract, even if he should afterwards sell to the same person with whom negotiations had been had prior to the expiration of the time limited, unless the delay was caused by the negligence, fraud, or default of the owner, this would not give a right to commissions. 19 Cyc. 254, and citations; *Emery* v. *Atlanta Exchange,* 88 *Ga.* 321.

Under his letter to Jackson, dated November 7, 1903, Bush agreed to give Jackson the option of purchasing the stock owned by him and represented by him as trustee, at a fixed price. For this option there was to be paid $40,000 in bonds, and, if the option was exercised and the stock paid for, the bonds should be returned, otherwise not. Both stock and bonds were to be deposited in the custody of the Georgia Railroad Bank, or with the Equitable Security Company, as Bush should elect. Bush was not only to make the offer for acceptance by Jackson, but, if it was accepted, he was to select the depository where the stock and bonds were to be deposited and held together in trust for the owners of the stock. This was an integral part of the contract allowing an option. In the letter from Bush to Jackson no time was specified. Hence a reasonable time might have been contemplated. But Phinizy had not only seventy shares in the "pool," but 375 shares beside. He wrote the letter authorizing Bush to sell all of his shares "in accordance with" the letter to Jackson; and agreed that he would pay, for Bush's service in making the trade, what the other stockholders should pay. But not being satisfied to leave the matter of time as in the other letter, he added: "This authority is good for thirty days only, to expire December 7, 1903." The other stockholders agreed to a different character of trade, selling the stock itself, instead of an option; but Phinizy declined to do this, and he was later segregated from them, and the trade proceeded on the original basis as to him. Relatively to him and his stock, the duties incumbent on Bush, under the letters referred to above, remained, and must have been complied with in the time limited, unless it was extended, or unless compliance was prevented by the fault of Phinizy, in order to bind him to pay commissions. Bear in mind that this was not a complete sale of his stock, but a contract for an option; it might be termed a sale of an option.

The bonds, instead of cash, were to be paid and deposited for the option. If it had been cash to be paid, and the time had been limited, there could be no doubt that it would have been necessary for the cash to have been paid or offered within that time, in order to have bound Phinizy. If an owner of property should say that a purchaser might have an option for a definite time, by paying a given amount in cash by a fixed date, it could not be claimed that the proposed purchaser could merely say that he would agree to take the option, and bind the owner without payment. And if a broker was employed to sell the option by a named day to a purchaser for a cash consideration, he could not say he had earned his commissions by agreeing for a credit, or to extend the time for payment beyond that day, substituting, in place of the cash which he was authorized to accept, a promise of the other party to pay at some indefinite time, or in a reasonable time. Here the bonds take the place of cash in the illustration. The point is controlled in principle by the decision in *Emery* v. *Atlanta Exchange, 88 Ga.* 321, 327, supra. See also *Larned* v. *Wentworth,* 114 *Ga.* 208. In *Emery's* case it was said: "In this case, the true test whether that compensation was earned is this: Was the sale completed within the agreed time; and if not, did the brokers within that time put the seller in a situation where, on failing to make the sale, he would have been liable to a good action by the purchaser for such failure? In other words, the sale would have to occur within the time agreed, or else be postponed beyond that time by the seller's fault. See *Hyams* v. *Miller,* 71 *Ga.* 608. It is plain that the purchaser could not maintain his action without having tendered the purchase-money before the option expired."

Under the undisputed evidence, the bonds were not put up as payment for the stock, nor was the depository even named, so far as disclosed, before December 7, when the time fixed expired; nor is there any evidence that Phinizy prevented the completion of the trade by that date. Unless Phinizy waived this or extended the time, Jackson could not have compelled him to proceed by merely agreeing within the time limited that he would take the option and pay for it later. And Bush could not say that he had completed his work and earned his commissions.

4. While a contract may be closed by a letter or telegram and become binding, yet before it is a binding trade, there must be a

mutual assent of the parties to the same thing in the same sense. If it is claimed that a seller has become bound by the acceptance of his offer by the buyer, the offer must be accepted unequivocally, unconditionally and without variance. *Robinson* v. *Weller,* 81 *Ga.* 704. Treating the two letters of November 7 as applying to Phinizy's stock alone, was the telegram of Jackson to Bush, dated December 5, such an acceptance of the proposition made as sufficed to bind Phinizy? We think there was a variance between the offer and the acceptance. The letter of Bush to Jackson, dated November 7, provided that, in the event the option should be exercised, there should be added to the price of fifty cents on the dollar of the par value of the stock interest at the rate of seven per cent. per annum on the purchase-price of the stock, "and the said interest shall be calculated from the date of this option up to and including the date upon which it is exercised." What was "the date of this option?" Was it the date of the letter making the offer? Or, if not, what date? Certainly not later than its acceptance. It would hardly be that Phinizy should be bound and liable for commissions on the ground that there was a complete, binding option contract, and yet interest did not run. The parties subsequently drew and signed, on December 28, a more formal contract, but there is nothing on the face of the original letter providing for it. The telegram of Jackson, dated December 5, says that the proposition for an option for twelve months is accepted, "with interest at seven per cent. per annum from date option is signed until payment." This evidently contemplated, not the date of the telegram or of the letter of November 7, but a future date, when some other signing should take place. This was not an acceptance of the offer without a variance or modification. The telegram was not a hasty or careless one. It was shown to have been fully discussed and carefully authorized at a meeting of the board of directors of the electric railway company for whom Jackson was acting. It also referred to the option accepted as one for twelve months, while strictly it was offered for six months, with the right to continue it for six months more by making a certain payment. But as it was stated that "we accept your proposition giving us an option for twelve months," this language could be considered in connection with the proposition, and was not necessarily a variance.

For the reasons stated, the sending of the telegram by Jackson to Bush, on December 5, did not of itself create a contract binding on Phinizy; and therefore did not alone entitle Bush to commissions on the basis of Phinizy's letter to him of November 7. An owner may agree to a variation or modification of the terms of a proposed contract; and if he does so, he will be bound by the contract as varied. If the broker undertakes to vary or modify the terms of the offer, the principal may reject the change, and decline to be bound, or he may ratify the change and will then be bound as if he had authorized it. As to what transpired between December 5 and December 16, the evidence was conflicting,— whether Phinizy declared the transaction at an end, and subsequently was induced to again take up negotiations and proceed under a new agreement from Bush as to his compensation, or whether the modified acceptance was ratified·and the trade treated as in force while a formal written contract was being prepared, with the concurrence of Phinizy, to perfect it. There was some evidence that the trade was spoken of, after December 7, by the parties, as a proposed agreement and a proposed sale; and this was urged as a circumstance to corroborate the view that the contract was not considered by the parties as binding; but there was conflict as to what took place, and that was for the jury.

5.  Phinizy was not bound prior to December 16, unless he ratified the modifications already referred to, so as to waive completion in the time limited by him in his letter of November 7, and accept the change as to interest. If he did not do this, he had a right to decline to go forward with the matter, whether or not his doing so would have caused Bush inconvenience or the loss of a sale of his own stock or other stock. He was entitled to stand on his contract, whether it was a liberal one or a strict one. Nor would the mere fact that he may have made a profit on his stock affect the question of whether or not Bush was entitled to commissions.

Again, it is said that the final contract signed varied from the primary proposal. It named the date when interest should run according to the telegram of Jackson, dated December 5, and it provided ten days after signature for depositing the stock and bonds. If Jackson was acting for the electric company, the placing of its name as the purchaser in the formal contract, without ob-

jection from Phinizy, would not amount to a novation. There were other minor changes, but they appeared to be in Phinizy's favor. If a person agrees to one contract, he is not bound to sign another varying from the first, unless he assents to the change. This, of course, he can do, and be bound. Gilder v. Davis, 137 N. Y. 504; 4 Am. & Eng. Enc. Law (2d ed.), 974, and citations; note to Walker v. Osgood, 93 Am. Dec. 175.

6, 7. If Phinizy was already liable to Bush for full commissions, and indebted therefor under his letter of November 7, an agreement to take less, without any new consideration, would not be binding. The Civil Code, §3735, provides that "An agreement by a creditor to receive less than the amount of his debt can not be pleaded as an accord and satisfaction, unless it be actually executed by the payment of the money, or the giving of additional security, or the substitution of another debtor, or some other new consideration." Davis & Co. v. Morgan, 117 Ga. 504. This rule has reference to a fixed liability or duty; and would not preclude an accord and satisfaction by securing a doubtful claim, or by an agreement based on a new consideration. Civil Code, §§3732, 3734. If Phinizy had already become bound by the contract for the sale of the option, and had become liable for a definite, fixed commission, and assented to the changes above referred to in the preparation of the formal contract, but refused to sign, not on the ground of any objection to the writing as not carrying out the previous contract, but merely to compel a waiving or partial remission of commissions already incurred, the agreement of December 16 would be without consideration. Mooney v. Elder, 56 N. Y. 238. And see Fenn v. Ware & Owens, 100 Ga. 563. But if Phinizy was not already bound and liable for a fixed commission before the agreement of December 16, and, in order to induce him to make a contract, Bush agreed to leave the amount of compensation to his determination, such agreement took the place of the original one as to commissions. Its effect is not now before us.

As Jackson, or his principal, agreed to trade with other sellers of stock in a separate and different way, and to deal with Phinizy alone, he could not be held responsible for results of a breach as if on a joint contract. It was either joint or several as to him. If it was joint, there was no right to turn it into a several con-

tract except by his consent. If it was not several at the outset, but became so by agreement, then as against him it could not be treated as a joint contract. We think the charge of the court touching the contention of Bush as to possible damages to him from a refusal of Phinizy to consummate the trade, without further explanation as to the rule touching non-liability of an agent acting for his principal, was calculated to make an erroneous impression on the jury, and one which may have had a serious effect upon their verdict. The situation of Bush could be shown in explanation of his conduct, but his· mere contention as to the legal effect of a refusal by Phinizy should not have been left to· stand, without explanation, where the judge's· attention was called to it by requests. The requests themselves, however, in this case were subject to criticism.

8-11. As to the liability of an agent on contracts· entered into in his own name, the Civil Code, §3022, declares: "The form in which the agent acts is immaterial; if the principal's name is disclosed, and the agent professes to act for him, it will be held to be the act of the principal." Section 3039 reads: ' "Where the agency is known, and the credit is not expressly given to the agent, he is not personally responsible upon the contract. The question to whom the credit is given is a question of fact to be decided by the jury under the circumstances in each case." An agent may expressly contract on his own credit and be bound, even though his principal be known. The declaration of intention and agreement in writing on the part of the agent to bind himself personally may be so explicit as to admit of no denial by parol. But usually where the principal is disclosed, the question is one of fact. *Cleaveland* v. *Stewart,* 3 *Ga.* 283; *Fleming* v. *Hill,* 62 *Ga.* 751; *Nall* v. *Farmers Warehouse Co.,* 95 *Ga.* 770; *Partridge* v. *Hollinshead,* 105 *Ga.* 278; *Raleigh & Gaston R. Co.* v. *Pullman Co.,* 122 *Ga.* 700. See also, on this subject, 1 Am. & Eng. Enc. L. 1118, and citations; 19 Cyc. 302, and citations.

It was also an erroneous statement of the defendant's contention to say that "Mr. Phinizy says that he owes Mr. Bush absolutely nothing." The jury may have been caused to believe that the issue was whether the plaintiff should be paid for his work $3.25 per share or nothing; while the real issue on this feature of the case was whether the measure of his compensation was to be on

the basis of the original letters of November 7, 1903, on which the suit was based, or according to the agreement contained in Bush's letter of December 16. In his answer to the petition the defendant denied that he owed the plaintiff anything under the contract sued on, but stated that he had offered to pay, and was still willing to pay, $1 per share; that this was under the agreement of December 16, and not the one on which the suit was founded; and that the plaintiff was not entitled to recover on such contract.

The expression used in the charge, that if, within the time limited in Phinizy's letter of November 7, Bush had sold Phinizy's stock, "and this sale had been consummated and closed so far as Bush could close the same," he would have earned his commissions, was subject to misinterpretation. It might have led the jury to think that, if Bush had done all he could to close the trade, he was entitled to commissions, whether or not he had succeeded, or had fulfilled the conditions of Phinizy's letter, and whether or not, if he failed, any fault of Phinizy's caused the failure. Our learned brother of the circuit bench probably did not mean this, but the jury may have so understood.

We hardly think that the reference to the sale of the stock and the consummation by delivery, and payment of the "money" therefor, complained of in the 14th ground of the motion, was entirely clear, taken with the context in which it was used. It must be borne in mind that the thing which had to be done within the limit of thirty days was to close the sale or trade for an option and do what was required for that purpose under the terms of the letters of November 7. The final delivery of the stock itself to the purchaser, if the option were exercised, and the payment of the money therefor, was a matter for later consummation. Doubtless this was what the presiding judge had in view. The case is one of closely contested evidence, and, in view of some inaccuracies in the charge, we think there should be a new trial.

Other grounds of the motion need no further discussion. Except so far as indicated in this opinion, they would not require a new trial.

*Judgment reversed. All the Justices concur, except Holden, J., who did not preside.*