In re BALDWIN RENTAL CENTERS INCORPORATED, Debtor.

Baldwin Rental Centers, Incorporated, Plaintiff,

v.

Case Credit Corporation

and

Falcon Power, Inc., Defendants.

Bankruptcy No. 97–50930–JDW.
Adversary No. 99–5008–JDW.

United States Bankruptcy Court,
S.D. Georgia,
Waycross Division.

July 31, 2000.

William S. Orange, III, Brunswick, Georgia, for debtor.

David A. Garland, Moore, Clarke, Du-Vall & Rodgers, P.C., Albany, Georgia, for Case Credit Corporation.

Daniell S. Landers, Waycross, Georgia, for Falcon Power, Inc.

### REVISED MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on separate Motions for Summary Judgment filed by each of the defendants, Case Credit Corporation ("Case Credit") and Falcon Power, Inc. ("Falcon Power"). Plaintiff, Baldwin Rental Centers, Inc. ("Debtor") filed an adversary proceeding captioned "Objection to Claim of Case Credit Corporation and Complaint for Damages Against Case Credit Corporation and Falcon Power." In this adversary, Debtor objects to the amended proof of claim filed by Case Credit Corporation in the pending chapter 11 case. The complaint seeks recovery of damages for breach of an oral contract against Case Credit and Falcon Power in an amount exceeding $3,000,000.00. The complaint also asserts a claim and seeks recovery against Case Credit pursuant to O.C.G.A. § 51–1–8 for breach of a private duty. The Court held a hearing to consider the motions for summary judgment on March 28, 2000. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2). After careful consideration of the pleadings, evidence, and applicable authorities, the Court hereby enters the following findings of fact and conclusions of law in compliance with Federal Rule of Bankruptcy Procedure 7052. The Court will consolidate the motions for summary judgment in this memorandum opinion.[1]

*Findings of Fact*

For purposes of the objection to claim and the motions for summary judgment, the following facts are treated as not being

---

1. This revised memorandum opinion replaces the Court's previous opinion of July 17, 2000, for the purpose of correcting minor clerical errors. The order entered on July 17, 2000, is not revised, and continues in full force and effect as entered.

in dispute. Debtor, Baldwin Rental Centers, Inc., filed a petition under chapter 11 of the Bankruptcy Code on August 20, 1997. Debtor is in the short-term equipment rental business and rents equipment to building contractors and home owners. Mr. Jerry Baldwin ("Mr. Baldwin"), Debtor's president, started the business by opening one store in Waycross, Georgia, in 1989 as a sole proprietorship. The business was incorporated in 1994 and, by that time, had expanded its operation to include several stores in South Georgia. In approximately 1994, Debtor developed a business relationship with the Case Company store in Jacksonville, Florida, from which Debtor would purchase Case equipment for its rental business. Typically, Case Credit Corporation would finance these transactions. In November 1994, Falcon Power, a company headquartered in Phoenix, Arizona, bought out the Case Company store in Jacksonville. Thereafter, Falcon Power became a dealer for Case Corporation and sold or leased Case equipment. After the acquisition, many of the former Case employees remained as Falcon Power employees. Debtor continued to do business with Falcon Power and Case Credit. Prior to 1995, a typical transaction among Debtor, Falcon Power, and Case Credit would involve Debtor purchasing a piece of Case equipment through the Falcon Power store with financing by Case Credit. Case Credit retained the right to approve or disapprove of the financing on a transaction by transaction basis.

Sometime in March 1995, Debtor, through Mr. Baldwin, had a meeting with Mr. Lou Fiala, the sales representative for Falcon Power, and Mr. Duane Murph, the Jacksonville store manager for Falcon Power.[2] At this meeting, the parties discussed several matters which included the sale or lease of equipment to Debtor, having Falcon Power sales representatives refer short-term (daily or weekly) rentals to Debtor and Debtor's sales representatives refer long-term (more than 3 months) rentals or purchases to Falcon Power, having Falcon Power set up a parts department for Case equipment in some of Debtor's stores on a consignment basis, having Falcon Power provide training to Debtor employees on Case equipment for maintenance purposes, and transporting equipment throughout South Georgia with an 18-wheel tractor-trailer. There are no notes or any form of written documentation evidencing the discussions of this meeting.

After this meeting, beginning on March 31, 1995, Debtor entered into a series of lease agreements with Falcon Power for the acquisition of various types of Case equipment. Debtor entered into twenty-three lease agreements between March 31, 1995 and October 31, 1996. The majority of these leases, seventeen of the twenty-three, were entered between March 31 and July 20, 1995. Each of Debtor's proposed lease applications and agreements was prepared by a Falcon Power representative and submitted directly to Case Credit, typically by an electronic transmission. Case Credit would either approve or disapprove of the lease application on a transaction by transaction basis. If the transaction was approved, a Falcon Power representative would prepare and complete the appropriate paperwork for Debtor to execute. If Case Credit disapproved the transaction, then the proposed lease agreement would be terminated. Each lease agreement was signed by Mr. Baldwin on behalf of the Debtor. Each lease agreement contains the following language: "In this Lease, 'I', 'my', 'me' and 'Customer' means the lessee; 'you', 'your'

---

2. Mr. Fiala is now deceased.

or 'Dealer' means the lessor." Baldwin Rental Center is listed as the Customer (lessee) and Falcon Power is listed as the Dealer (lessor). In addition, each lease agreement entered into by Debtor contains a clause referred to as "Totality of Agreement" which states the following:

This Agreement contains the entire agreement between you and me unless a change is agreed to in writing by you and me and accepted by any party to whom you assign this Agreement.

The terms of each lease provide that it was to be immediately assigned to Case Credit. The twenty-three lease agreements constitute the only written evidence of transactions among Debtor, Falcon Power, and Case Credit.

As a result of Debtor entering into the series of lease agreements for various types of Case equipment, Debtor was greatly increasing the size of its inventory. The equipment Debtor was leasing included, but was not limited to, backhoes, wheel loaders, crawler dozers, and skid steerers. Some of this equipment was new to Debtor's inventory. Some of this equipment was similar to other types of equipment made by other manufacturers that Debtor had in its inventory prior to March 1995. Debtor was becoming one of the largest customers for the Falcon Power store in Jacksonville, Florida. At the same time, Debtor was incurring a substantial liability with Case Credit. At some point during their relationship, Case Credit established a credit limit for Debtor in the amount of $1.5 million. On more than one occasion, Debtor reached this credit limit and would have to "pay down" the credit limit prior to acquiring more equipment.

In addition to acquiring the equipment in March 1995, Debtor purchased a 18–wheel tractor trailer. This vehicle was to be used to transport equipment throughout South Georgia. Debtor opened new stores in Albany and Valdosta, Georgia, sometime after March 1995. These stores increased Debtor's store number to seven throughout South Georgia. In four of Debtor's stores, Falcon Power set up a department for Debtor to carry and sell Case parts. The parts department was set up on a consignment basis whereby a Falcon Power representative would stock the parts in the store and maintain the inventory on a monthly basis. After each inventory was taken, Falcon Power would bill Debtor for the amount of parts that had been removed from the inventory. Falcon maintained the parts department and inventory for approximately six months. Debtor also received four signs to place in its store windows to show the general public that it was selling parts for Case equipment.

While the record is not clear as to specific dates, there is evidence in the form of deposition testimony that Debtor had other meetings and discussions with representatives of Falcon Power after March 1995. However, there was no representative from Case Credit at any of the meetings between Debtor and Falcon Power that occurred prior to August, 1995. On or about August 15, 1995, Mr. Baldwin had a meeting with several representatives from Falcon Power and Case Credit in Valdosta in which matters were discussed including Debtor's equipment needs and plans for future expansion. This was the first meeting Debtor had with representatives from Case Credit. There are no written notes or documentation evidencing the discussions of this meeting or the events that took place at this meeting.

By mid–1996 and into 1997, it became apparent to Debtor that the equipment on Debtor's yard was not being rented sufficiently to meet its financial obligations under the lease agreements with Case Credit. Debtor had reached its credit limit

with Case Credit. Debtor attempted to meet with representatives from Case Credit to refinance the lease agreements or get assistance in changing the mix of its Case equipment inventory. This was not successful. Debtor subsequently filed for protection under chapter 11 of the Bankruptcy Code on August 20, 1997. In Debtor's bankruptcy schedules, Debtor does not list an interest in a partnership or joint venture with Falcon Power or Case Credit. In addition, Debtor's schedules do not list any executory contracts or agreements with Falcon Power or Case Credit. Debtor's Schedule B lists a potential law suit against Case Corporation for an unknown amount. Case Credit filed claim number 62 in Debtor's chapter 11 case which was amended to $58,759.13 secured, $363,459.45 unsecured, and $119,108.43 administrative priority. Falcon Power filed an unsecured claim, designated as number 57, in Debtor's chapter 11 case in the amount of $28,140.33.

### Conclusions of Law

### I. Debtor's Objection to Claim of Case Credit

The Court will first consider Debtor's objection to the claim of Case Credit. Case Credit Corporation filed claim number 62 on January 12, 1998. In response to this Court's Memorandum Opinion and Order dated December 1, 1998, Case Credit amended their claim to $58,759.13 secured, $363,459.45 unsecured, and $119,180.43 administrative priority. Debtor asserts the following objections to the claim. First, Debtor alleges that the liquidated damage clause found in each of the lease agreements entered into between Debtor and Case Credit are not reasonable and are punitive in nature and should be disregarded. Second, Debtor objects to the mathematical calculations of Case Credit in formulating its claim. Third, Debtor alleges that Case Credit failed to mitigate its damages by selling the equipment for less than its fair market value and failing to sell it in a commercially reasonable manner. Debtor seeks a reduction in the amount of the amended claim filed by Case Credit, or in the alternative, Debtor seeks to have the claim disallowed for breach of an oral contract.

The Court will address each of these objections in turn. First, in its Memorandum Opinion and Order dated December 1, 1998, this Court addressed the reasonableness of the liquidated damages clause found in each of the lease agreements entered into between Debtor and Case Credit. Although Debtor filed a notice of appeal of that Order, Debtor withdrew the notice. Accordingly, this Court's Order of December 1, 1998, stands as the law of the case and this portion of Debtor's objection is hereby overruled. Second, at the hearing on March 28, 2000, the parties notified the Court that Case Credit further amended its proof of claim which resolved Debtor's objection to the mathematical calculations. Finally, if Debtor has evidence to present to the Court regarding its objection to the commercial reasonableness of the sale of the collateral, then the Court will schedule a hearing to consider that issue. Debtor's counsel shall notify the Court and request a hearing in writing within 15 days from the date of this Order. Otherwise, if Debtor's objection to the Case Credit claim has been resolved, then the Court directs Debtor to withdraw that portion of its Objection and Complaint.

### II. Debtor's Complaint for Damages Against Case Credit and Falcon Power

█ The issue presented to the Court is whether the parties entered into a binding oral contract whereby Debtor can recover damages from Falcon Power or Case Credit for the breach of such oral contract. Debtor alleges that the parties en-

tered into an oral contract as a result of the meeting in March 1995, subsequent meetings, and the parties' conduct. Debtor asserts that this contract provided that Debtor would join forces with Falcon Power and Case Credit in that Debtor would become the exclusive short-term rental house for Case equipment in South Georgia. Case Credit and Falcon Power respond by asserting that there was no binding contract entered into among the parties. In the alternative, Defendants argue that if the Court finds that a contract was entered into among the parties, then they assert numerous defenses to the complaint for breach of contract.

Summary judgment is appropriate when there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c); *Combs v. King,* 764 F.2d 818, 827 (11th Cir.1985). The party seeking summary judgment may do so by showing that an essential element of the non-movant's case is lacking. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Fed.R.Civ.P.* 56(c)). Once the moving party has properly supported its motion with such evidence, the party opposing the motion " 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) and *Fed.R.Civ.P.* 56(e)). If there is a genuine issue of fact in dispute, summary judgment must be denied. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung,* 695 F.2d 1294, 1296–97 (11th Cir.1983). A fact is material if it may affect the outcome of the case under the governing substantive law. *Anderson,* 477 at 248, 106 S.Ct. 2505. A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court finds that, after reviewing all facts and reasonable inferences in favor of the Debtor as the nonmoving party, summary judgment is appropriate on the ground that the merits of the case fail to establish the creation of an oral contract under Georgia law.

Debtor makes a number of allegations in support of its position that the parties entered into an oral contract, that the defendants breached the terms of that contract, and that Debtor is entitled to recover a substantial sum of money for the alleged breach. Because of the complexity of this matter, the following outline of Debtor's allegations will be beneficial to lay the foundation of Debtor's cause of action. Debtor alleges that Mr. Fiala and Mr. Murph approached Debtor at the March 1995 meeting with an offer to enter into a business relationship that Debtor describes as a "joint undertaking" or a "tri-partite business relationship" among Debtor, Falcon Power, and Case Credit. Debtor asserts that this agreement changed their prior business relationship from buyer/seller to some type of partnership whereby Debtor would become the exclusive rental house, parts provider, and warranty work provider for Falcon Power and Case Credit in South Georgia. Debtor asserts that the concept behind this agreement was for Debtor to provide short-term rentals of Case equipment to customers

with the hope that customers would eventually enter into a longer term lease or purchase the equipment from Falcon Power with financing by Case Credit. Thus, Debtor claims that the agreement would benefit all the parties because Falcon Power and Case Credit focused on a long-term lease or purchase and Debtor could enhance its business by providing customers with a short-term trial run of a piece of Case equipment. In addition, Debtor's stores would be a more convenient place for Case customers in South Georgia to obtain equipment, parts, or warranty work since the nearest Falcon Power store was located in Jacksonville, Florida.

As part of the "joint undertaking" agreement, Debtor asserts that it was required to do the following: 1) carry a full line of Case equipment, 2) open new stores in Valdosta and Albany, 3) purchase an 18–wheel tractor-trailer to transport equipment around South Georgia, 4) allow four of its stores to carry parts for Case equipment, and 5) have its mechanics trained by Falcon Power to do warranty work in South Georgia on Case equipment. Debtor asserts that Falcon Power's part of this agreement was to: 1) have Falcon Power sales representatives in the South Georgia territory provide support and referrals to guarantee that Debtor would have customers for the short-term rental of Case equipment to enable Debtor to maintain its financial obligations to Case Credit, 2) provide Debtor with Case equipment, 3) set up a parts department in four of Debtor's stores on a consignment basis whereby Falcon Power employees would maintain the inventory and accounting records, 4) provide Debtor with signs for the four stores so customers would know that Case parts were available in the store, 5) provide the training for Debtor employees to do warranty work on Case equipment, and 6) provide business for Debtor to haul

Case equipment in South Georgia using the 18–wheel tractor trailer.

Although there were not any Case Credit representatives at the March 1995 meeting, Debtor asserts that Case Credit was a party to this agreement because Debtor understood that Case Credit would provide unlimited financing for Debtor to acquire the equipment. Debtor later learned that the funding was not unlimited because Case Credit set a credit limit of $1.5 million for Debtor. Debtor asserts that Mr. Fiala and Mr. Murph acted with the apparent authority and consent to bind Case Credit to the terms of this agreement because they were former employees of Case Corporation.

Debtor asserts that it accepted the terms of the agreement and began performing its obligations under the oral contract by doing several things. Debtor entered into the large number of lease agreements with Falcon Power and Case Credit starting March 31, 1995. The acquisition of this equipment significantly increased Debtor's inventory compared to the size of Debtor's inventory prior to March 1995. Debtor asserts that the volume and type of equipment it received evidences the agreement. In addition, Debtor asserts that the fact it obtained such a high credit limit from Case Credit evidences their participation in the "joint undertaking" in that Debtor became more than just a customer to Falcon Power and Case Credit. Debtor had business cards printed up so that Falcon Power sales representatives could distribute them while making sales calls. Debtor alleges that there was an agreement whereby Falcon Power sales representatives would receive a commission for referrals of customers to Debtor. Debtor also purchased an 18–wheel tractor-trailer to haul equipment throughout South Georgia. Debtor opened up new stores in Albany and Val-

dosta. Debtor received four signs from Falcon Power to place in its stores to advertise that Debtor was carrying Case equipment parts.

Debtor alleges that Falcon Power and Case breached the terms of the oral agreement because they were involved in its creation and, therefore, had an obligation to see that the terms were fulfilled. Specifically, as to Falcon Power, Debtor alleges that it: 1) failed to provide the field support and generate short-term rentals of the equipment to keep up with the volume of equipment leases being made by Debtor, 2) failed to utilize the tractor-trailer purchased by Debtor to haul equipment, and 3) failed to train Debtor's mechanics to perform warranty work on Case equipment. Debtor alleges that it was led to believe that its expense of purchasing or leasing the equipment through Case Credit would be adequately covered by the referrals from Falcon Power representatives. As to Case Credit, Debtor alleges that it breached the agreement because it was a part of the original undertaking, and when the deal fell through, it was part of the violation. In addition, Debtor alleges that Case Credit breached the agreement by not assisting in refinancing the leases or rebalancing the inventory.

■ In this case, the Court must separate enforceable from unenforceable promises to determine if a valid oral contract existed between the parties. The Restatement Second of Contracts defines a contract as follows: "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Restatement (Second) of Contracts* § 1 (1979). "A contract had been defined as a promise enforceable at law directly or indirectly. It imports a legally enforceable obligation directly assumed by or imposed on the contractor, to do something." *In re*

*Packer Ave. Assoc.*, 1 B.R. 286, 289 (Bankr.E.D.Pa.1979) (citing *Corbin on Contracts* § 3 (1961)). Georgia law defines a contract in general as "an agreement between two or more parties for the doing or not doing of some specified thing." O.C.G.A. § 13–1–1 (2000). In general, the three basic requirements for the formation of a contract are offer, acceptance, and consideration. If these elements are lacking, then an enforceable contract does not exist. Georgia law provides, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contact can operate." O.C.G.A. § 13–3–1.

Debtor acknowledges that there are no written documents, memoranda, or notes evidencing the alleged agreement. Therefore, the Court will consider the enforceability of an alleged oral contract. Oral contracts may be enforceable under Georgia law which provides, "[p]arol contracts shall include only contracts in words as remembered by witnesses." O.C.G.A. § 13–6–1. The Court will look to the words and conduct of the parties to determine the terms of an oral agreement. In the case of *Super Valu Stores, Inc. v. First Nat'l Bank of Columbus*, the District Court for the Middle District of Georgia stated,

> For oral contracts to be enforceable under Georgia law it must be shown that there was a meeting of the minds of the contracting parties [and] mutuality as to every essential element of the oral agreement. It must be shown "with reasonable certainty as to what the parties were obligating themselves to do to effect what they envisioned ...", and "in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show

what the parties agreed upon. A contract cannot be enforced in any form of action if its terms are incomplete ... incomprehensible...." vague, indefinite or uncertain.

*Super Valu Stores, Inc. v. First Nat'l Bank of Columbus*, 463 F.Supp. 1183, 1193 (M.D.Ga.1979) (citing *Bagwell–Hughes, Inc. v. McConnell*, 224 Ga. 659, 661, 164 S.E.2d 229, 231 (1968) and *Gragg v. Hall*, 164 Ga. 628, 139 S.E. 339 (1927)).

■ In this case, the Court finds that the defendants are entitled to summary judgment because the evidence is not sufficient to present a triable issue as to the existence of an oral contract. The facts supporting Debtor's allegations are not persuasive and fail to support its complaint against Falcon Power and Case Credit. Georgia law is clear in that there must be a meeting of the minds of the contracting parties and mutuality as to every essential element of an oral contract. *Id.* In addressing the rules of construction of a contract, the Supreme Court of Georgia stated, "[t]here must be a mutual consent of the parties thereto, and they must assent to the same thing, in the same sense.... Both parties must assent to the same thing, in order to make a binding contract between them." *Robinson v. Weller*, 81 Ga. 704, 8 S.E. 447, 449 (1888). The evidence presented fails to show a meeting of the minds or mutual assent among Debtor, Falcon Power, and Case Credit. The Court cannot find that the parties came to a meeting of the minds in March 1995 for several reasons. First, only two of the parties, Debtor and Falcon Power, were present at the March 1995 meeting. Debtor's first contact with a representative from Case Credit occurred at the meeting in August 1995. Second, the Court finds that the evidence fails to show that either Mr. Fiala, the Falcon Power sales representative, or Mr. Murph,

the Falcon Power store manager, had the authority to bind either Falcon Power or Case Credit to the alleged contract. Mr. Fiala and Mr. Murph were in the business of selling or leasing equipment to Debtor. The deposition testimony of Mr. Murph shows that individual store managers had limited authority to bind Falcon Power to commitments. (Murph Dep. at 15, 19). The evidence reflects that these gentlemen, while making a sales call on Debtor, had some discussions with Debtor about expanding business in South Georgia. The Court finds that these discussions did not create a binding oral contract in that the essential elements for the creation of a contract are lacking. Before an alleged contract can be binding, the offer must be accepted "unequivocally, unconditionally, and without variance of any sort." *Robinson*, 81 Ga. at 707, 8 S.E. at 449; *see also Arnett v. Tuller*, 134 Ga. 609, 68 S.E. 330 (1910); *Phinizy v. Bush*, 129 Ga. 479, 59 S.E. 259 (1907); *Larned v. Wentworth*, 114 Ga. 208, 39 S.E. 855 (1901). In this case, the Court finds there was no meeting of the minds or mutual assent by the parties to any terms which would create an enforceable contract under Georgia law.

■ As to Case Credit, the Court finds that Mr. Fiala and Mr. Murph did not have the authority to bind Case Credit to the alleged three-party agreement. Debtor argues that because they were originally employees of the Case Corporation store in Jacksonville, Florida, and remained with Falcon Power after the buyout, Mr. Fiala and Mr. Murph somehow remained agents of Case Credit and continued to represent Case Credit, and thus had the authority to bind Case Credit to this agreement. Debtor makes an assumption that such authority exists based on their conduct and course of dealing but Debtor fails to provide any evidence that Case Credit authorized the Falcon employ-

ees to act on their behalf. "[W]here the only evidence that a person is an agent of another party is the mere assumption that such agency existed, or an inference drawn from the actions of that person that he was an agent of another party, such evidence has no probative value and is insufficient to authorize a finding that such an agency exists." *Shivers v. Sexton*, 164 Ga.App. 490, 491, 296 S.E.2d 749 (1982). Mr. Murph testified in his deposition that he did not have any authority to enter into contracts or to act on behalf of Case Credit. (Murph Dep. at 27). The Court does not find Debtor's argument persuasive, and finds that Mr. Fiala and Mr. Murph did not have the authority to bind Case Credit to the terms of the alleged agreement.

The evidence reveals that there was no representative from Case Credit at the meeting in March 1995 and that Debtor never contacted Case Credit to confirm their participation in any joint undertaking. The evidence also shows that Debtor first met with Case Credit representatives in August 1995, which was after Debtor entered into a substantial number of lease agreements with Case Credit. Debtor argues that the purpose of this meeting was to review their commitment and confirm the agreement so that the parties could understand their roles in the joint undertaking. Debtor testified that he made a presentation at the meeting which addressed several matters, including how the program worked financially, the future needs and next generation of equipment, and commission rates for Falcon Power representatives who refer customers to Debtor. (Baldwin Dep. at 89–90). The Court cannot find that the participation of Case Credit and Falcon Power representatives at this meeting evidences their consent to the alleged agreement, or created an enforceable contract with Debtor. The meeting occurred at a time when Debtor

had already entered into a large number of lease agreements with Falcon Power and Case Credit, thereby becoming a large customer of both companies. The representatives at the meeting did not have the authority to bind Case Credit or Falcon Power to the complex type of agreement which Debtor alleges. Mr. Baldwin testified that he was aware that the Case Credit representatives at that meeting did not have the authority to approve the program outlined at the meeting. (Baldwin Dep. at 92–94).

Debtor argues that Case Credit was a party to this agreement because it was the financing arm of the deal and was to provide Debtor unlimited financing to acquire the equipment. The Court finds Debtor's understanding that Case Credit would provide unlimited financing for the business relationship unreasonable. The evidence reflects that Debtor assumed that Case Credit was aware of the agreement. Debtor never contacted anyone at Case Credit to confirm their participation in the alleged agreement. (Baldwin Dep. at 81, 83). The record reflects, and Debtor acknowledges, that at some point during their relationship Case Credit established a credit limit for Debtor in the amount of $1.5 million. (Baldwin Dep. at 111).

Next, Debtor argues that Case Credit participated in this joint undertaking because the extension of a $1.5 million credit limit to Debtor, which was a relatively small business, was substantial and that Debtor was not required to submit financial statements to support such a high credit limit. The Court does not find Debtor's argument persuasive. The evidence shows that Case Credit was approving or disapproving each lease proposal submitted by Debtor through Falcon Power on a transaction by transaction basis. The decision to extend or not to extend credit was a business decision to be made

by Case Credit and did not rise to the level of conduct that would evidence their assent to the creation of the alleged oral agreement with Debtor and Falcon Power.

The Court finds that Debtor's assertion that the Falcon Power sales representatives were to support Debtor by making referrals to generate short-term rentals for Debtor which would cover Debtor's costs of acquiring the Case equipment is not convincing evidence of any joint venture. The evidence reflects that there were a total of five short-term rental transactions that Debtor made which were attributed to the efforts of Falcon Power representatives from March 1995 through June 1997. The evidence shows that there was only one commission check in the amount of $586.90 paid by Debtor to Mr. Fila, the Falcon Power sales representative, for such referrals. (Baldwin Dep.Ex. B–4). The evidence reflects that there was never any system or method set up for the parties to track referrals or commissions. (Parrish Dep. at 75). The fact that Debtor had business cards printed up for Falcon Employees to distribute to customers whom they referred to Debtor fails to evidence an agreement. There was never any requirement for Falcon Power sales representatives to provide a designated number of referrals to Debtor. The Court is not persuaded that Debtor, in acquiring such a large amount of Case equipment, would rely on Falcon Power sales representatives to guarantee short-term lease rentals to cover its financial liability to Case Credit. Debtor's reliance on Falcon Power employees to guarantee short-term lease rentals is unreasonable. The most that a Falcon Power sales representative could do for Debtor would be to refer customers to Debtor's business, not guarantee that the customer would rent from Debtor.

Debtor asserts that it was required to carry a full line of Case equipment to fulfill its obligation under the alleged agreement, and that the Falcon Power representatives decided which equipment Debtor was to lease and receive to make up Debtor's inventory. Essentially, Debtor is stating that it relinquished its decision making and control over its inventory of Case equipment to Falcon Power sales representatives. The Court believes that Debtor would not surrender such control of its business decisions to employees of another corporation. Debtor made its own business decisions for several years prior to developing a relationship with Falcon Power and Case Credit. In addition, the Court does not find Debtor's argument persuasive because Debtor was the only one signing the lease agreements and liable under the terms of the lease agreement. Each lease agreement entered into by Debtor lists Falcon Power as the "Dealer" and Debtor as the "Customer." If Debtor did not need a particular piece of equipment, then Debtor could have refused to enter into the lease agreement. Debtor also argues that sometimes the equipment would arrive prior to the lease being signed, which evidences the fact that Debtor did not have control over the equipment being ordered and delivered. This argument does not persuade the Court because Debtor had the option of not signing a lease agreement and returning the equipment to Falcon Power.

Debtor asserts that the fact that Falcon Power set up a parts department for Case parts to be sold in four of Debtor's stores evidences their agreement. The Court is not persuaded that the establishment of a parts department in four of Debtor's stores rises to the level of creating a binding contract between Debtor and Falcon Power. The evidence reveals that the parts department was set up on a consignment basis whereby Falcon Power's parts

representative would stock the parts, maintain the inventory, and all of the records. Debtor would be billed for the parts that had been removed from the inventory. While the dates were not clear from the record, the parts departments and inventory lasted for approximately six months. Mr. Murph testified that the purpose of having the parts stocked in Debtor's stores was to have them available for Debtor to perform maintenance on its Case equipment inventory. (Murph Dep. at 86). There was nothing in writing as to the parts agreement between Debtor and Falcon Power, and there are too many issues that were not addressed by the parties to show that there was a meeting of the minds to create an enforceable agreement. There is no evidence that Debtor discussed or received permission from Case Credit to carry a Case parts inventory. There was no agreement as to the type of parts that were to be stocked. There was no agreement as to the projected volume of sales for the parts. The Court finds that the establishment of a consignment parts department by Falcon Power in Debtor's stores does not impute liability to Falcon Power or Case Credit for loses suffered by Debtor.

At some point after March 1995, Debtor received several signs for four of their store windows stating, "Case Parts Sold Here." Debtor argues that the signs were purchased by Falcon Power on Debtor's behalf. There is no evidence that Case Corporation approved obtaining signs for Debtor's stores. The evidence that Falcon Power obtained the signs for Debtor's stores is consistent with the establishment of the consignment parts department in the stores. All of the parts were handled by Falcon Power employees. For the reasons outlined above regarding the parts department, the Court is not persuaded by Debtor's argument that a binding contract was created among the parties.

The Court cannot construe Debtor's allegation that Falcon Power would train Debtor's employees to do warranty work on Case equipment as evidence of the alleged agreement that Debtor would become the exclusive warranty repair provider in South Georgia because the training never occurred. Once again, there are too many issues which remain unanswered to reflect a meeting of the minds and mutual assent to an agreement. There was no date set to train the employees or time line within which the mechanics were to be trained. There was no agreement as to the extent or type of training which Debtor's employees would receive.

Debtor acknowledges that there are no written instruments, other than the individual lease agreements, evidencing this "joint undertaking" or "tri-partite agreement." There are no written documents, instruments, or memoranda. Indeed, the individual lease agreements constitute the only written documentation or evidence of a relationship among the parties. Although there was deposition testimony that a former Falcon Power employee saw a memo regarding the approval by Falcon Power's management as to the short-term rental referrals to Debtor and receiving commissions, which was on Falcon Power stationery and disbursed, the memorandum itself was not produced and would be the highest and best evidence to support this allegation. (Thompson Dep. at 62).

The allegations set forth in the case at bar are similar to the case of *Soar v. NFL Players' Assn.,* 550 F.2d 1287 (1st Cir.1977), wherein the United States Court of Appeals for the First Circuit considered the enforceability of an alleged oral contract. "It is fundamental that for a contract to be enforceable it must be of sufficient explicitness so that a court can perceive what are the respective obli-

gations of the parties ... [W]e are convinced that the district court properly found that the alleged oral contract was too indefinite to be enforced even if it fulfilled the other conditions of a valid contract...." *Id.* at 1289–90 (citations omitted). The *Soar* court found that the purported oral contract left too many unanswered questions:

> It is clear that any agreement which leaves unanswered such critical questions cannot by any reasonable stretch of the imagination be said to represent a real meeting of the minds. While an enforceable contract might be found in some circumstances if one or more such questions were left unanswered, ... the accumulation in the instant case of so many unanswered questions is convincing evidence that there never was a consensus ad idem between the parties.

*Id.* at 1290. This case presents similar problems in that the evidence shows that numerous essential terms of the contract previously outlined by the Court were simply not addressed by the parties, therefore defeating the creation of a binding contract.

The Court finds that this alleged three-party agreement cannot be construed as an enforceable contract because the terms of the contract are simply not clear and explicit.

> A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even though that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and

uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.

*Abrams v. Illinois College of Podiatric Medicine,* 77 Ill.App.3d 471, 476, 32 Ill. Dec. 680, 395 N.E.2d 1061, 1065 (1979) (citing 1 *Corbin on Contracts* § 95, at 394 (1963) and 1 *Williston on Contracts* § 37 (3d ed.1957)). In this case, the terms of the alleged agreement are too vague to create an enforceable contract. Although Debtor makes a number of allegations in support of its position on the creation of a binding contract, there are simply too many questions left unanswered as to the terms of the contract. In order for the Court to find a binding contract, the Court would have to create many of the essential terms in order to fashion a remedy. Debtor acknowledges that there were no specifics set forth regarding the agreement, rather it was a general understanding between the parties. (Baldwin Dep. at 303–06). There was no time frame set for the agreement. There were no firm numbers set regarding the terms of the agreement. There was no designated dollar volume on the rental referrals to be made by Falcon representative. There were no sales projections on the parts inventory. There was no set date regarding the training of Debtor's employees. There was no set amount or volume of warranty work or service work that would be performed by Debtor. There was no agreement regarding the sharing and burden of profits and losses. In this case, the Court declines to shift the burden of Debtor's financial losses to Case Credit and Falcon Power in the absence of an enforceable contract among the parties.

Summary judgment is appropriate in this case because the Court finds that there was not an enforceable contract created among the parties. Accordingly, the

Court will enter an order granting the motions for summary judgment in favor of Case Credit and Falcon Power. Debtor's complaint for damages against Case Credit for breach of a private duty pursuant to O.C.G.A. § 51–1–8 will be dismissed.

In the pleadings, both Defendants raise a number of defenses to Debtor's complaint including the Statute of Frauds, estoppel, and merger. The Court would expect such defenses to be raised in light of the facts of this case. However, because the Court finds that there was no binding contract entered into among the parties, the Court declines to address these defenses.